**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISON**

REPUBLICAN NATIONAL COMMITTEE,
    310 First St. S.E., Washington, DC 20003

MARYLAND REPUBLICAN PARTY,
    PO Box 631, Annapolis, MD 21404
    Anne Arundel County

REARDON SULLIVAN,
    15833 Crabbs Branch Way, Rockville, MD 20855
    Montgomery County

and NICOLEE AMBROSE,
    1109 Bellemore Road, Baltimore, MD 21210
    Baltimore City

                                        *Plaintiffs,*

v.

JARED DEMARINIS, in his official capacity as State
Administrator of Elections; MICHAEL SUMMERS, JIM
SHALLECK, VICTORIA JACKSON-STANLEY, DIANE
BUTLER, in their official capacities as Members of the Board of
Elections;
    151 West St., Suite 200, Annapolis, MD 21401
    Anne Arundel County

ANN BALCERZAK, DONNA THEWES, TIMOTHY
MUMMERT, RAYMOND RANKIN, and PAUL RIVERS, in
their official capacities as members of the Howard County Board
of Elections; and
    9770 Patuxent Woods Dr #200, Columbia, MD 21046
    Howard County

DAVID NAIMON, DANIEL KOROMA, AMORETTA
HOEBER, KEYNA ANYIAM, ALEXANDER VINCENT,
MARGIE DELAO, and LAWRENCE HALLORAN, in their
official capacities as members of the Montgomery County Board
of Elections,
    18753 N. Frederick Ave., Ste. 210, Gaithersburg, MD 20879
    Montgomery County

                                        *Defendants.*

No. 1:25-cv-3989

<u>COMPLAINT</u>

Plaintiffs the Republican National Committee, the Maryland Republican Party, Reardon Sullivan, and Nicolee Ambrose, file this complaint under the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §20507, against Defendants for declaratory and injunctive relief. Plaintiffs allege as follows:

## **INTRODUCTION**

1.     Section 8 of the NVRA requires States to maintain clean and accurate voter registration records.

2.     That requirement includes making reasonable efforts to remove ineligible, deceased, or inaccurate registrations.

3.     Maryland has failed to live up to the NVRA's requirements.

4.     At least two of Maryland's most populous counties report more registered voters than they have adult citizens who are over the age of 18. That number of voters is impossibly high.

5.     An additional ten counties report voter registration rates that exceed 95 percent of adult citizens over the age of 18. That figure far eclipses the national and statewide voter registration rate in recent elections.

6.     Plaintiffs aren't the first to shine a light on Maryland's failure to live up to its NVRA obligations. Just two years ago, the Office of Legislative Audits of the Maryland General Assembly found that the State Board of Elections' processes "were not as comprehensive as necessary," and that "the review of voter registration data remained inadequate." Office of Legislative Audits, *Audit Report: State Board of Elections*, at 11, 12 (Oct. 31, 2023) (Ex. A). The auditors identified thousands of potential deceased and duplicate active voter registrations.

7.     Based on this and other evidence, Defendants are failing to make a reasonable effort to conduct appropriate list maintenance as required by the NVRA.

## JURISDICTION AND VENUE

8.      The Court has subject-matter jurisdiction because this case alleges violations of the NVRA. *See* 28 U.S.C. §1331; *Ex parte Young*, 209 U.S. 123 (1908).

9.      Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this District and because some Defendants "reside" here. 28 U.S.C. §1391.

## PARTIES

10.     Plaintiff, the Republican National Committee (RNC), is the national committee of the Republican Party, as defined by 52 U.S.C. §30101(14), with its principal place of business at 310 First Street S.E., Washington, DC 20003.

11.     The RNC represents over 30 million registered Republicans in all 50 states, the District of Columbia, and the U.S. territories. It is comprised of 168 voting members representing state Republican Party organizations, including three members who are registered voters in Maryland.

12.     The RNC works to elect Republican candidates to state and federal office. In June and November 2026, its candidates will appear on the ballot in Maryland for numerous federal and state offices.

13.     The RNC has vital interests in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in Maryland elections and elsewhere. The RNC brings this suit to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its members, affiliated voters, and candidates.

14.     The State's maintenance of voter rolls directly affects the RNC's ability to provide services to candidates and voters, and to accomplish its core activities of electing Republican candidates and turning out Republican voters in local, state, and federal elections.

15.     Plaintiff Maryland Republican Party (MDGOP) is a political party in Maryland, and it is steered by a State Central Committee. The MDGOP exercises its federal and state constitutional

rights of speech, assembly, petition, and association to recruit, develop, and elect representative government at the national, state, and local levels, and to promote sound, honest, and representative government at the national, state and local levels.

16.     Based on current registration lists, the MDGOP represents over 1,027,000 active registered Republican voters in Maryland as of November 2025. But because of Defendants' poor list maintenance, the MDGOP is unable to determine exactly who is a registered Republican in Maryland, or how many registered Republican voters it represents. The MDGOP's efforts to represent those Republicans are hindered by the uncertainties of the Defendants' poorly maintained voter rolls.

17.     Like many state-level political parties, the MDGOP relies on voter registration data reported by the State to coordinate campaign-related activities and get-out-the-vote efforts. The MDGOP is injured by the inaccuracy of voter rolls because it must divert resources away from other mission-critical activities, toward these efforts to reach eligible voters.

18.     The RNC and MDGOP engage in daily voter registration services for candidates, voters, and local state parties. When a State fails to maintain clean voter rolls, the RNC and MDGOP cannot provide effective registration services for those groups. Republican candidates and local state parties have interests in registering *eligible* voters. And only *eligible* voters have an interest in registering to vote. But when a State fails to remove ineligible voters, fails to move voters to inactive status, and fails to remove voters who have been listed as inactive for two Maryland election cycles, it harms those efforts. Inaccurate voter rolls impede the ability of candidates, voters, and local state parties to know who needs to be registered and who needs to update their registration.

19.     The State's maintenance of voter rolls also directly affects the RNC and MDGOP's ballot-chase programs and voter-turnout efforts. The number of voters registered in a State and locality drive the organizations' modeling efforts, providing a roadmap of voters who need to be

contacted and driven out to vote. A false report of registered voters hinders the RNC and MDGOP's ability to effectively chase ballots and turn out voters in a given State or locality.

20.     The RNC and MDGOP's ballot-chase efforts are harmed in particular because Maryland maintains a permanent mail-in voter list. All eligible voters need only check a box when registering, and they will receive mail-in ballots for every subsequent election. Md. Elec. Law Code §9-311.1(b). Inaccurate voter rolls result in more ineligible voters receiving mail ballots, which results in the RNC and MDGOP chasing ballots of citizens who are not even eligible to vote.

21.     In addition, the RNC and MDGOP have limited time, employees, volunteers, and money. In each State and locality, the RNC and MDGOP must allocate these resources to elect Republican candidates and turn out Republican voters. For example, when a State or locality shows that few people are registered to vote, the organizations must focus on voter-registration services in that jurisdiction. Conversely, when a State shows a significant number of voters registered to vote, the organizations must focus instead on voter-turnout efforts. When a State has failed to maintain its voter rolls, the RNC and MDGOP are unable to determine whether they need to prioritize voter registration or voter turnout, which harms their ability elect Republican candidates and turn out Republican voters.

22.     The RNC and MDGOP also rely on state voter rolls for their voter contacts. The RNC and MDGOP contact voters through mail and digital avenues, as well as both volunteer and paid in person contacts. These voter-contact efforts are essential to electing Republican candidates and turning out Republican voters. The organizations use voter rolls to adjust the size, scope, and audience for these voter contacts. Inaccurate voter rolls harm the effectiveness of these voter-contact efforts, resulting in contacts with registered voters who are no longer eligible to vote and resulting in mail pieces being printed and sent but never properly delivered.

23.     The RNC and MDGOP also provide essential contact support to Republican candidates that win their respective primaries. That support includes knocking on doors, making

phone calls, sending text messages, mailers, and registering voters. Voter rolls inform who should be contacted in that candidate's jurisdiction. When voter rolls incorrectly report that those contacts are eligible to vote, it hinders the Republican candidate's ability to effectively target eligible voters, which harms her chances of winning that election.

24.     The RNC and MDGOP rely on voter registration numbers to form their electoral strategies. State voter registration data forms the foundation of the RNC and MDGOP's internal datasets. If the state's voter rolls show more active voters registered to vote than is accurate, the organizations' electoral and campaign strategies will be based on a false picture of Maryland's electorate. That inaccurate information impairs their ability to form winning strategies around voter turnout, voter registration, mail-voting campaigns, and in-person efforts.

25.     Voter registration data also informs how competitive a district is. The RNC and MDGOP use voter registration lists to identify the number of Republicans, Democrats, and independents in a district. If a district is competitive, then the organizations deploy resources, including field observers, recruitment staff, and other employees and volunteers to target the district. Bloated rolls result in an inaccurate assessment of electoral competition, which harms the RNC and MDGOP's ability to elect Republican candidates.

26.     Voter registration data is also important for voter contacts. The RNC and MDGOP send text messages to registered voters in the district, which is important for getting volunteers, informing voters of late-breaking election news, and turning out voters. Bloated rolls result in the organizations wasting time and money contacting individuals who are registered but not qualified to vote, thus harming RNC and MDGOP's ability to elect Republican candidates and turn out Republican voters.

27.     Because of inaccurate voter registration information, the RNC and MDGOP divert additional resources to get-out-the-vote efforts away from other mission-critical activities. Maryland's

bloated rolls prevent the organizations from distinguishing between eligible voters and those who are ineligible to vote, which harms their ability to elect Republican candidates and turn out Republican voters.

28.    The RNC and MDGOP also rely on voter registration to determine whose interests in Maryland they represent. Because of Defendants' poor list maintenance, the RNC and MDGOP are unable to determine exactly who is a registered Republican in Maryland, or how many registered Republican voters there are. Their interest in representing Maryland Republicans is injured if they cannot accurately determine how many Republicans are registered in Maryland, and who they are.

29.    This inability to identify qualified voters also decreases the effectiveness of the RNC and MDGOP's mail-in fundraising efforts, which rely on voter registration information to contact potential donors who are members of the party. Inaccurate voter information leads to fundraising mail being sent to the wrong address. This is doubly injurious to the organizations, as it wastes resources on fundraising mail and diminishes the fundraising that registered Republicans would send in response.

30.    Finally, inaccurate voter rolls increase the likelihood of fraud and abuse in the election system in a manner that harms the RNC and MDGOP. Maryland has, for example, reported deceased and ineligible voters on the voter rolls, claiming that the workload of maintaining an accurate roll exceeded its resources. Office of Legislative Audits, *Audit Report: State Board of Elections*, at 11, 12, 29 (Oct. 31, 2023), perma.cc/XJP4-QXDJ.

31.    One recent example underscores Maryland's negligence. A registered Maryland voter, Ian Roberts, was discovered to be a noncitizen residing in Iowa after he was arrested for immigration-related offenses. Jessica Babb, *Election Watchdog Group Calls for Review of Maryland Voter Registration Processes*, Fox45News (Oct. 8, 2025), perma.cc/G7SR-F63U. Roberts was a registered Democrat in Prince George's County who had submitted two voter registration applications, five years apart.

Rebecca Pryor, *Watchdog Uncovers Ian Roberts' MD Voter Registration Application, Says It Raises Red Flags*, Fox45News (Oct. 16, 2025), perma.cc/P3NP-XH7Y. Despite Roberts being neither a United States citizen nor a Maryland resident, Maryland failed to detect his ineligibility at the time of his two applications and allowed him to remain on the voter rolls for years.

32.    Maryland likely has many noncitizens on its voter rolls today. Over the past few years, Arkansas, Oregon, Ohio, Georgia, Florida, Texas, Virginia, Alabama, Michigan, New Hampshire, Louisiana, Iowa, Massachusetts, and others have collectively removed tens of thousands of noncitizens from their voter rolls. Noncitizen voting favors Democratic candidates and harms Republican candidates. And maintaining noncitizens' registrations facilitates that injury.

33.    The MDGOP has the same interests in this case as the RNC and seeks to vindicate those interests in the same ways.

34.    In addition, the MDGOP sends election mail pieces as bulk mail to registered Republicans in Maryland. Because bulk postage rates do not include return of undeliverable mail, it would be prohibitively costly to determine the actual state of a voter file based entirely on mail. To do so would require both mailing at standard postage rates and paying additional postage for any pieces that were returned to the address on file for the mailer. Bloated voter rolls thus result in the MDGOP sending election mailers to thousands of voters who are not qualified to vote.

35.    For example, the MDGOP mailed out over 4 million mail pieces in support of Republican candidate Larry Hogan during the 2024 U.S. Senate election in Maryland. The MDGOP spent over $1.5 million on mailings for that race. If even five percent of the statewide voter registrations are inaccurate, the MDGOP spent at least $75,000 sending get-out-the-vote mailers to Maryland addresses unassociated with a registered voter, on one race alone. Maryland's rolls are many times worse than that, as this Complaint alleges. But for Maryland's bloated voter rolls, the MDGOP would have been able to successfully contact the voters it was intending to persuade to vote. This

injury to the MDGOP is multiplied for every election race in which there is a Republican candidate. And it will continue to occur in future races unless this Court grants Plaintiffs' requested relief.

36.     The Maryland GOP also conducts door-to-door canvassing activities to engage and persuade Maryland voters to vote for Republican candidates. Recent door knocking efforts revealed that nearly 7% of contacted registered voters were no longer residing at the address where they were officially registered. These inaccuracies force the MDGOP to waste significant time and resources attempting to reach voters at incorrect addresses. These resources would otherwise be spent contacting voters where they actually reside.

37.     Each of these injuries harms the RNC and MDGOP's ability to turn out Republican voters and elect Republican candidates. The RNC and MDGOP work to mitigate each of these injuries by diverting substantial resources to counteract the effects of the State's failure to maintain clean rolls. But because they have limited time, employees, volunteers, and money, they must divert resources from other efforts that are critical to its core activities, such as voter-registration efforts and voter-turnout efforts.

38.     Proper voter roll maintenance would redress each of these injuries. Reasonable efforts to remove ineligible, deceased, or relocated voters would reduce the wasted resources that the RNC and MDGOP currently spend trying to contact or turn out votes from registered voters who cannot vote. Reasonable efforts to clean up the voter rolls would also enable to the RNC and MDGOP to better identify their members.

39.     Plaintiff Reardon Sullivan is a registered Maryland voter and the Montgomery County GOP Chairman, who also serves as Chairman of a local ballot initiative committee known as the Committee to Control Montgomery County Spending. He regularly votes in Maryland's primary and general elections. He plans to vote in Maryland's upcoming federal, state, and local elections and ballot measures.

40.    Because Defendants do not maintain accurate voter rolls, Mr. Sullivan reasonably fears that ineligible voters can and do vote in Maryland elections. Those votes will dilute his legitimate vote. And Maryland's inaccurate rolls undermine Mr. Sullivan's confidence in the integrity of Maryland elections, which also burdens his right to vote.

41.    Mr. Sullivan is an active member of the Republican Party, and his positions as chairman of the Montgomery County GOP and the Committee to Control Montgomery County Spending are made more difficult by inaccurate voter rolls and voter fraud. Ballot initiatives and local party election efforts rely on accurate voter registration records to coordinate signature gathering and achieve support thresholds. He also shares the same interests as the RNC, which are injured by Maryland's inaccurate rolls, and seeks to vindicate his interests in the same ways.

42.    Plaintiff Nicolee Ambrose is a registered Maryland voter and a statewide elected Republican National Committeewoman for Maryland. She regularly votes in Maryland's primary and general elections. She plans to vote in Maryland's upcoming federal, state, and local elections and ballot measures. She previously ran for office in a federal election, and a won a GOP primary for Maryland's 2nd congressional district.

43.    Because Defendants do not maintain accurate voter rolls, Ms. Ambrose reasonably fears that ineligible voters can and do vote in Maryland elections. Those votes will dilute her legitimate vote. And Maryland's inaccurate rolls undermine her confidence in the integrity of Maryland elections, which also burdens her right to vote.

44.    As a voting member of the RNC representing Maryland, Ms. Ambrose's position is made more difficult by inaccurate voter rolls and voter fraud. As a representative, Ms. Ambrose is injured by inaccurate voter registrations that skew exactly who she represents. She also shares the same interests as the RNC, which are injured by Maryland's inaccurate rolls, and seeks to vindicate her interests in the same ways.

45.    Defendant Jared DeMarinis is the State Administrator of Elections. He is "the chief State election official" for Maryland and must "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list." Md. Elec. Law §2-103(b). State law requires him to "define, maintain, and administer the statewide voter registration list," and with the county boards, he must "ensure the currency and accuracy of each individual voter's registration record," and "remov[e] from the statewide voter registration list information about voters who are no longer eligible to be registered voters," and to "establish and conduct a program to identify voters who have changed their addresses." Md. Elec. Law §3-101(c). He is sued in his official capacity.

46.    Defendant Michael Summers is a board member and the Chairman of the State Board of Elections. As Chairman, he is responsible for running Board meetings, setting agendas, and acting as the Board's primary point of contact for the State Administrator of Elections. *See* State Board of Elections Bylaws, Art 2, Sec. 2.2.A. Together with the rest of the Board, he is responsible for "manag[ing] and supervis[ing] elections in the State and ensur[ing] compliance with the requirements of … any applicable federal law by all persons involved in the elections process." Md. Elec. Law §2-102(a). He is sued in his official capacity.

47.    Defendant Jim Shalleck is a board member and the Vice Chairman of the State Board of Elections. Together with the rest of the Board, he is responsible for "manag[ing] and supervis[ing] elections in the State and ensur[ing] compliance with the requirements of … any applicable federal law by all persons involved in the elections process." Md. Elec. Law §2-102(a). He is sued in his official capacity.

48.    Defendant Victoria Jackson-Stanley is a board member of the State Board of Elections. Together with the rest of the Board, she is responsible for "manag[ing] and supervis[ing] elections in the State and ensur[ing] compliance with the requirements of … any applicable federal

law by all persons involved in the elections process." Md. Elec. Law §2-102(a). She is sued in her official capacity.

49.     Defendant Diane Butler is a board member of the State Board of Elections. Together with the rest of the Board, she is responsible for "manag[ing] and supervis[ing] elections in the State and ensur[ing] compliance with the requirements of … any applicable federal law by all persons involved in the elections process." Md. Elec. Law §2-102(a). She is sued in her official capacity.

50.     Defendant Ann Balcerzak is the President of the Howard County Board of Elections. Together with the rest of the Howard County Board of Elections, at the instruction of the State Administrator, she must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). She is sued in her official capacity.

51.     Defendant Donna Thewes is the Vice President of the Howard County Board of Elections. Together with the rest of the Howard County Board of Elections, at the instruction of the State Administrator, she must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). She is sued in her official capacity.

52.     Defendant Timothy Mummert is a member of the Howard County Board of Elections. Together with the rest of the Howard County Board of Elections, at the instruction of the State Administrator, he must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). He is sued in his official capacity.

53.     Defendant Raymond Rankin is a member of the Howard County Board of Elections. Together with the rest of the Howard County Board of Elections, at the instruction of the State Administrator, he must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). He is sued in his official capacity.

54.     Defendant Paul Rivers is a member of the Howard County Board of Elections. Together with the rest of the Howard County Board of Elections, at the instruction of the State

Administrator, he must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). He is sued in his official capacity.

55.    Defendant David Naimon is the President of the Montgomery County Board of Elections. Together with the rest of the Montgomery County Board of Elections, at the instruction of the State Administrator, he must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). He is sued in his official capacity.

56.    Defendant Daniel Koroma is the Vice President of the Montgomery County Board of Elections. Together with the rest of the Montgomery County Board of Elections, at the instruction of the State Administrator, he must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). He is sued in his official capacity.

57.    Defendant Amoretta Hoeber is the Secretary of the Montgomery County Board of Elections. Together with the rest of the Montgomery County Board of Elections, at the instruction of the State Administrator, she must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). She is sued in her official capacity.

58.    Defendant Keyna Anyiam is a member of the Montgomery County Board of Elections. Together with the rest of the Montgomery County Board of Elections, at the instruction of the State Administrator, she must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). She is sued in her official capacity.

59.    Defendant Alexander Vincent is a member of the Montgomery County Board of Elections. Together with the rest of the Montgomery County Board of Elections, at the instruction of the State Administrator, he must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). He is sued in his official capacity.

60.    Defendant Margie Delao is a substitute member of the Montgomery County Board of Elections. Together with the rest of the Montgomery County Board of Elections, at the instruction of

the State Administrator, she must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). She is sued in her official capacity.

61.     Defendant Lawrence Halloran is a substitute member of the Montgomery County Board of Elections. Together with the rest of the Montgomery County Board of Elections, at the instruction of the State Administrator, he must "ensure the currency and accuracy of each individual voter's registration record." Md. Elec. Law §3-101(c)(2)-(3). He is sued in his official capacity.

## BACKGROUND

### I. Federal law requires States to maintain accurate voter rolls.

62.     Congress enacted the NVRA "to protect the integrity of the electoral process." 52 U.S.C. §20501(b)(3). Specifically, section 8 was enacted "to ensure that accurate and current voter registration rolls are maintained." *Id.* §20501(b)(4).

63.     Retaining voter rolls bloated with ineligible voters harms the electoral process, heightens the risk of electoral fraud, and undermines public confidence in elections. "Confidence in the integrity of our electoral processes is," in turn, "essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

64.     Section 8 obligates States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" due to death or change of residence. 52 U.S.C. §20507(a)(4). "[F]ederal law makes this removal mandatory." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 767 (2018).

65.     Each State's program for maintaining voter-registration lists must be "uniform, non-discriminatory, and in compliance with the Voting Rights Act." 52 U.S.C. §20507(b)(1).

66.     Specifically, section 8 requires States to "remove the names of ineligible voters from the official lists of eligible voters by reason of (A) the death of the registrant or (B) a change in the residence of the registrant" to outside her current voting jurisdiction. 52 U.S.C. §20507(4)(A)-(B).

67. The Help America Vote Act (HAVA) also mandates that states adopt computerized statewide voter registration lists and maintain them "on a regular basis" in accordance with the NVRA. 52 U.S.C. §21083(a)(2)(A).

68. States must "ensure that voter registration records in the State are accurate and are updated regularly," an obligation that includes a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. §21083(a)(4).

69. HAVA's list-maintenance requirements include coordination with "State agency records on death" and "State agency records on felony status" to facilitate the removal of individuals who are deceased or rendered ineligible under state law due to a felony conviction. 52 U.S.C. §21083(a)(2)(A)(ii)(I)-(II).

70. State law also requires the State Administrator to "define, maintain, and administer the statewide voter registration list," including "establish[ing] and conduct[ing] a program to identify voters who have changed their addresses," and instructing local boards on "removing from the statewide voter registration list information about voters who are no longer eligible to be registered voters." Md. Elec. Law §3-101(c)-(d).

71. According to the bipartisan Carter-Baker Commission, "registration lists lie at the root of most problems encountered in U.S. elections." Comm. on Federal Election Reform, Building Confidence in U.S. Elections 10 (Sept. 2005) (Carter-Baker Report). Inaccurate voter rolls that contain "ineligible, duplicate, fictional, or deceased voters" invite "fraud." *Id.* Although voter fraud is often difficult to detect, "the risk of voter fraud [is] real," and can "affect the outcome of a close election." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (op. of Stevens, J.). And regardless of whether fraud is detected, "the perception of possible fraud contributes to low confidence in the system." Carter-Baker Report, *supra*, at 18. The Supreme Court agrees. *See Crawford*, 553 U.S. at 193-97.

72.    In 2014, the Presidential Commission on Election Administration highlighted similar concerns with voter registration. The Commission noted that "[i]mproving the accuracy of registration rolls … can expand access, reduce administrative costs, prevent fraud and irregularity, and reduce polling place congestion leading to long lines." *The American Voting Experience,* Presidential Commission on Election Administration (Jan. 2014), perma.cc/7WAX-6BVM. The Commission detailed some of the harms that flow from inaccurate voter rolls: "The quality of the list can affect the ability of people to vote, of election offices to detect problems, and of courts and others monitoring elections to detect election fraud or irregularities. A list with many incorrect records can slow down the processing of voters at polling places resulting in longer lines." *Id.* at 22-23.

73.    Other courts and experts have likewise recognized that voter fraud is both real and notoriously "difficult to detect and prosecute." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 396 (5th Cir. 2020); *see also Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) ("Voting fraud is a serious problem in U.S. elections … and it is facilitated by absentee voting."); *Veasey v. Perry*, 71 F. Supp. 3d 627, 641 (S.D. Tex. 2014) (finding broad "agreement that voter fraud actually takes place in abundance in connection with absentee balloting").

74.    Fraud is not the only problem with inaccurate voter rolls. "The quality of the list can affect the ability of people to vote, of election offices to detect problems," in addition to concerns over "monitoring elections to detect election fraud or irregularities." *The American Voting Experience, supra*, at 22. "Election officials across the political spectrum recognize the value of accurate" voter registration lists, *id.*, as the NVRA itself reflects.

75.    Maryland has known flaws in its voter roll's accuracy. The State Board of Elections' list maintenance has failed two consecutive audits by the Office of Legislative Audits since 2019, despite receiving and supposedly implementing recommendations for improvement. Office of

Legislative Audits, *Audit Report: State Board of Elections*, at 9 (Oct. 31, 2023); Office of Legislative Audits, *Audit Report: State Board of Elections*, at 7-9 (Dec. 12, 2019).

76.    Maintaining accurate voter rolls is especially important given that Maryland maintains a permanent mail-in voter list. Md. Elec. Law Code §9-311.1(b). Inaccurate voter rolls result in more ineligible voters receiving mail ballots, and "courts have repeatedly found that mail-in ballots are particularly susceptible to fraud." *Tex. Democratic Party*, 961 F.3d at 414 (Ho, J., concurring).

77.    To help address voter fraud and ensure compliance with federal election law, the NVRA includes a private right of action. It empowers any "person who is aggrieved by a violation" to "provide written notice of the violation to the chief election official of the State involved." 52 U.S.C. §20510(b)(1). "If the violation is not corrected within 90 days after receipt of a notice … the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief." *Id.* §20510(b)(2).

## II. Defendants have specific obligations under the NVRA.

78.    Federal and state law make Maryland's State Administrator of Elections primarily responsible for list maintenance.

79.    The NVRA requires each State to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under" the law. 52 U.S.C. §20509.

80.    Maryland law designates the Administrator of Elections as the State's chief election officer charged with overseeing and maintaining voter registration.

81.    Ultimate responsibility for coordinating and overseeing all list maintenance activities rests with the Administrator. A chief election official "may not delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such a program is not reasonably conducted." *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).

82.     Indeed, "the NVRA's centralization of responsibility counsels against ... buck passing." *Scott v. Schedler*, 771 F.3d 831, 839 (5th Cir. 2014). Courts have rejected the view that, "once the state designates" a local entity to assist with complying with federal law, "her responsibility ends." *Harkless v. Brunner*, 545 F.3d 445, 452 (6th Cir. 2008). "[I]f every state passed legislation delegating" their responsibilities "to local authorities, the fifty states would be completely insulated from any enforcement burdens." *Id.*

## III.    Defendants have failed to comply with their list-maintenance obligations.

83.     Just a decade ago, "24 million voter registrations in the United States—about one in eight—[were] either invalid or significantly inaccurate." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 760 (2018) (citing Pew Center on the States, Election Initiatives Issue Brief (Feb. 2012)). Maryland is no exception, and the evidence underscores the inaccuracy of Maryland's registration records.

84.     The U.S. Census Bureau's American Community Survey is one of the most accurate, up-to-date estimates of citizen voting age population (CVAP) available. *See* U.S. Census Bureau, *Using 1-Year or 5-Year American Community Survey Data* (Sept. 2020), perma.cc/V5WK-3CCV. The ACS 1-year estimate collects 12 months of data for areas with populations greater than 65,000 people. The 1-year estimate is the "[m]ost current data available," but given the smaller sample size is "[l]ess reliable" than the 5-year estimate. *Id.* The 5-year estimate collects 60 months of data for all areas. It is the "[m]ost reliable" data available but, given the longer time frame, is less current than the 1-year estimate. *Id.*

85.     As of December 2024, Maryland had a statewide active registration rate of 96%—calculated by dividing the number of active registered voters by the number of citizens of voting age. The statewide total registration rate (both active and inactive voters) for the same period is 101%.

86.     A statewide active registration rate of 96% is improbably high. A statewide total registration rate of 101% is impossibly high.

87.    The U.S. Election Assistance Commission's 2024 Election Administration and Voting Survey reported a similar percentage of active registrants at 95.91%. Counting both active and inactive voter registration for that year, the number of registered voters in Maryland was 102.9% of CVAP. That is, Maryland reports 143,739 more registered voters than there are eligible voters in the State.

88.    Comparing CVAP data and the Board's own reported active registered voter count reveals that two counties—Howard and Montgomery—record more active registered voters than voting-eligible citizens who live there. Howard reports a 103.28% active voter registration rate, while Montgomery reports a 100.2% active voter registration rate. These numbers have consistently remained near or above 100 percent for the last five years: Howard (99.2%-101.2%); Montgomery (98.8%-100.1%).

89.    Other counties, including Queen Anne's, Charles, Carroll, Calvert, Dorchester, Harford, Prince George's, Talbot, and Worcester maintain suspiciously high rates of active voter registration above 90%, according to 2024 EAVS data.

90.    These voter registration rates are abnormally or—in the case of counties with greater than 100 percent registration—impossibly high.

91.    According to the U.S. Census Bureau, 73.6% of the citizen voting-age population was registered to vote nationwide in the November 2024 election.

92.    And 69.1% of the citizen voting-age population was registered nationwide in the November 2022 election.

93.    Similarly, 72.7% of the citizen voting-age population was registered nationwide in the November 2020 election.

94.    Maryland and its counties are significant statistical outliers, touting voter registration rates 25 to 30 percentage points higher than the national figures from 2024, 2022, and 2020.

95.     There is no evidence that these counties experienced above-average voter participation compared to the rest of the country or State on anything like this scale. In the November 2024 elections, for example, Maryland voters were only five percent above national averages in terms of actual voter turnout. Nowhere near the 20+ percentage points above national averages reflected in Maryland's registrations.

96.     Nor can these discrepancies be attributed to more voters moving into Maryland. As the comptroller of Maryland recently reported, "Maryland has been experiencing net domestic outmigration—that is more people moving out of Maryland to other states than moving into Maryland from other states—for each of the past 12 years." Comptroller of Md., *State of the Economy Series: Housing & the Economy* 4 (Oct. 2025), perma.cc/QLQ3-MN8R. Population turnover for that period has also remained relatively low and thus cannot be a driver of bloated voter rolls.

97.     Nor can discrepancies on this scale be attributed to early registration of 16-year-olds, or any other Maryland-specific demographic figures. The only explanation for these discrepancies is substandard list maintenance and a lack of reasonable effort by the Defendants.

98.     "[S]ignificantly high registration rates" such as these "give rise to the inference" that election officials are "not properly implementing a program to maintain an accurate and current voter registration roll, in violation of the NVRA." *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 791 (W.D. Tex. 2015).

99.     The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of … a change in the residence of the registrant." 52 U.S.C. §20507(a)(4)(B).

100.     A state can meet the "reasonable effort" requirement for removing voters who have changed residences by using "change-of-address information supplied by the Postal Service" and

taking certain actions depending on where the information indicates the voter moved. *Id.* §20507(c)(1)(A).

100. When this National Change of Address (NCOA) information indicates the voter has moved addresses within the registrar's jurisdiction (intra-county movers), the NVRA envisions the registrar changing the registrant's registration address and "send[ing] the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information…." *Id.* §20507(c)(1)(B)(i).

102. The NVRA outlines a different process when NCOA information indicates the voter has moved outside the registrar's jurisdiction (inter-county movers). Registrars do not automatically update the address. Instead, they send a similar notice to those who have moved within the registrar's jurisdiction "on which the registrant may state his or her current address…." *Id.* §20507(d)(2)(A).

103. The NVRA then envisions that "[i]f the card is not returned … and if the registrant does not vote in an election" "during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice … [then] the registrant's name will be removed from the list of eligible voters." *Id.* §20507(d)(2)(A). But a returned confirmation notice from the registrant suffices as a confirmation in writing.

104. Unlike the NVRA's process, Maryland's list maintenance doesn't distinguish between intra-county and inter-county movers. Md. Elec. Law § 3-502(b). In both scenarios, "the appropriate election official shall change the voter's record and send the voter a confirmation notice." *Id.*

105. Even though inter-county movers receive a confirmation notice, upon information and belief, Maryland does not inactivate and eventually cancel these voters' registrations unless the confirmation notice is returned.

106.    In short, Maryland does not inactivate and eventually remove suspected inter-county voters after the confirmation mailing is not returned and the waiting period expires (as envisioned by the NVRA). At best, it applies that process only to inter-*state* voters. Even though these inter-county movers are sent a confirmation notice like suspected out-of-state voters, unless they take the time to return it to correct a potential error, they are not inactivated and eventually removed.

107.    Adherence to the NVRA's confirmation mailing directives is mandatory. 52 U.S.C. §21803(a)(4)(a) (minimum standards include a state "remov[ing] registrants … who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office…."); *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 767 (2018) ("Not only are States allowed to remove registrants who satisfy these requirements, but federal law makes this removal mandatory.").

108.    Even though EAVS Survey data showed that more than 1.5 million confirmation notices were unreturned between the 2022 general election and the 2024 general election, only 123,312 voters were removed for failing to respond.

109.    Defendants' mailing practices are deficient in other ways. Around March of 2015, the State Board of Elections directed localities to stop conducting list maintenance using undeliverable mail returned by USPS that bears a yellow return label without any identifying information such as the voter's name. These yellow labels, also known as "NIXIES," constitute a high percentage of mail returned to election officials.

110.    The Board previously had a policy allowing counties to conduct list maintenance on this returned mail under certain conditions.

111.    Maryland's lack of other list-maintenance measures, together with inaction on NIXIES, shows a total lack of "reasonable efforts" to remove registrants who have likely changed addresses or are deceased.

112. The Board has also been twice audited and criticized for its failure to remove duplicate and deceased voters from the rolls. The repeated nature of the findings demonstrates ongoing, systemic, and uncorrected deficiencies in the state's list-maintenance practices.

113. The NVRA and HAVA require election officials to "perform list maintenance … by reason of the death of the registrant under [52 U.S.C. §20507(a)(4)(a)], the State shall coordinate … with State agency records on death." 52 U.S.C. §21083(a)(2)(A)(ii)(II).

114. Defendants have not made reasonable efforts to remove deceased voters or maintain accurate death records.

115. For example, the Board would not remove a potentially deceased voter's registration unless the death record perfectly matched the registration name in spelling and format. Office of Legislative Audits, *Audit Report: State Board of Elections*, at 11 (Oct. 31, 2023). For example, the Board would not investigate "results that reflect John T. Smith on one data set and John Thomas Smith on the other data set." *Id.*

116. Furthermore, the Board is aware that the information received from the Maryland Department of Health was not complete and did not include all individuals who died in Maryland. *Id.* But it made no effort to acquire more comprehensive data.

117. Even the 2023 Audit's limited review of the statewide voter list discovered 2,426 deceased individuals with active voter registrations, 761 of whom resided outside of the state when they died but were somehow still registered in Maryland. *Id.*

118. In its 2019 audit, the Office of Legislative Audits recommended that the Board increase its oversight of local election boards' efforts to remove duplicate and deceased voters. Office of Legislative Audits, *Audit Report: State Board of Elections*, at 7-9 (Dec. 12, 2019). The Board promised to implement that recommendation. But the Board still failed the 2023 Audit because it did not act on

any information it received from its increased oversight, and local boards did not correct their errors. Office of Legislative Audits, *Audit Report: State Board of Elections*, at 11-12 (Oct. 31, 2023).

119.    As a result, Maryland's voter rolls included duplicate registrations across counties and duplicate registrations with voters registered in other states. In sum, "the review of voter registration data remained inadequate." *Id.* at 12.

120.    The unchanged high voter registrations reported in the 2024 EAVS report shows that, once again, SBE has not implemented reasonable measures in response to these audit-exposed failures.

121.    Defendants State Board of Elections members and DeMarinis have also recently enacted an official policy to make it more difficult for local election officials to remove deceased voters by restricting the types of source materials they can use to cancel registrations of deceased voters. This policy exacerbates the existing loopholes for ineligible voters to remain on the rolls.

122.    Defendants' failure to maintain accurate voter rolls violates federal law and jeopardizes the integrity of the State's future elections.

## IV.    List-maintenance lawsuits in other States have remedied similar NVRA violations.

123.    The United States sued Indiana for violating the NVRA in 2006, noting in its complaint that "25 counties had registration totals of 90-95%" of their voting-age population. Indiana quickly confessed to violating the NVRA in a consent decree.

124.    Private organizations sued Indiana in 2012, explaining that "26 counties … have voter registration rolls that contain between 90% and 100% of TVAP." The court denied the defendants' motion to dismiss, and Indiana agreed to conduct a significant, statewide process to clean up its voter rolls.

125.    Ohio was sued on the same grounds, and it ultimately agreed to implement heightened review of the accuracy of its voter rolls.

126.    In December 2019, another organization sued Detroit under the NVRA, alleging that "Detroit has more registered voters than adult citizens of voting age (106%)." The suit was dismissed on June 29, 2020, because Detroit removed substantial numbers of invalid registrations.

127.    In June 2020, a voter sued Michigan's Secretary of State and Direct of Elections for violating the NVRA. The complaint alleged that one county had more registered voters than adult citizens over the age of 18, and an additional 15 counties had voter registration rates that exceeded 90 percent of adult citizens over the age of 18. The court denied the defendants' motion to dismiss, and Michigan agreed to slate 177,000 erroneous registrations for cancellation and implement other list-maintenance reforms.

128.    In September 2021, voters sued North Carolina, alleging that "40 counties in North Carolina have registration rates that far eclipse the national and statewide voter-registration rate in recent elections." The district court denied the defendants' motion to dismiss, and the parties settled the case.

## V. Plaintiffs provided Defendants notice of their statutory violations.

129.    Under the NVRA, "Plaintiffs have [statutory] standing assuming they provided proper notice within the meaning of 52 U.S.C. §20510(b)(1)." *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1362 (S.D. Fla. 2016).

130.    On July 18, 2025, Plaintiffs mailed a statutory notice letter to Defendant Jared DeMarinis, the State Administrator of Elections; as well as to the State Board of Elections, the Howard County Board of Elections, and the Montgomery County Board of Elections. *See* Ex. B.

131.    The July 18 letter notified the Administrator and the officials of the counties identified in the letter that they "are not conducting appropriate list maintenance to ensure that the voter registration roll is accurate and current, as required by federal law."

132.    The letter provided evidence of the violation by identifying two Maryland counties that have more registered active voters than voting-eligible citizens, and three other counties that have suspiciously high rates of voter registration, according to the most recent census data at the time.

133.    Plaintiffs have since received updated comparisons based on recently available data. Those numbers are reflected in the allegations above.

134.    The notice stated that Plaintiffs "hope[d] to avoid litigation and would welcome immediate efforts by your office to bring Maryland into compliance with Section 8."

135.    Plaintiffs asked that Defendants ensure they have a "comprehensive, nondiscriminatory" list maintenance program in place that complies with federal law, and to "identify and remove" several categories of ineligible individuals "from the official lists of eligible voters."

136.    Plaintiffs also asked that Defendants "respond in writing within 45 days of the date of this letter," "fully describ[ing] the efforts, policies, and programs [they] are taking, or plan to undertake before the 2026 general election to bring Maryland into compliance with Section 8," as well as when they "plan to begin and complete each specified measure and the results of any programs or activities [they] have already undertaken."

137.    Additionally, Plaintiffs asked Defendants to state "what policies are presently in place, or will be put in place, to ensure effective and routine coordination of list maintenance activities," and "a description of the specific steps [Defendants] intend to take to ensure routine and effective list maintenance on a continuing basis beyond the 2024 election."

138.    Finally, Plaintiffs requested that Defendants take steps to preserve documents as required by section 8(i) of the NVRA, 52 U.S.C. §20507(i)(1)-(2), and other federal law. *See, e.g.*, *In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 963 (S.D. Tex. 2010) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.").

139.    The notice letter stated that Plaintiffs would file a lawsuit under 52 U.S.C. §20510(b)(2) if the identified violations were not corrected within 90 days of receipt of the letter.

140.    Defendants have failed to correct the violations of the NVRA identified in the notice letter and this complaint.

141.    Plaintiffs Reardon Sullivan and Nicolee Ambrose, and all individual members of the RNC and MDGOP who are lawfully registered to vote in Maryland have rights under both the U.S. Constitution and the Maryland Constitution to vote in federal and state elections, as well as statutory rights under both federal and state law to the safeguards and protections set forth in the NVRA.

142.    Defendants' failure to comply with their NVRA voter-list maintenance obligations burdens the right to vote of the individual Plaintiffs and all individual members of the RNC and MDGOP who are lawfully registered to vote in Maryland by undermining their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, and instilling in them the fear that their legitimate votes will be nullified or diluted by unlawful votes.

143.    Defendants' failure to comply with their NVRA voter-list maintenance obligations also infringes the federal and state statutory rights of Mr. Sullivan, Ms. Ambrose, and the individual members of the RNC and MDGOP who are lawfully registered to vote in Maryland. These individuals have a statutory right to vote in elections for federal office that comply with the procedures and protections required by the NVRA.

## COUNT
## Violation of the NVRA

144.    Plaintiffs incorporate all their prior allegations.

145.    Defendants are failing to make reasonable efforts to conduct voter-list maintenance as required by 52 U.S.C. §20507(a)(4).

146.    Plaintiffs suffer ongoing irreparable injuries as a direct result of Defendants' violation of section 8 of the NVRA.

147.     Plaintiffs will continue to be injured by Defendants' violations of the NVRA until Defendants are enjoined from violating the law.

148.     Plaintiffs have no adequate remedy at law.

**WHEREFORE,** Plaintiffs ask this Court to enter judgment in their favor and provide the following relief:

A.     A declaratory judgment that Defendants are in violation of section 8 of the NVRA;

B.     A permanent injunction barring Defendants from violating section 8 of the NVRA;

C.     An order instructing Defendants to develop and implement reasonable and effective registration list-maintenance programs to cure their failure to comply with section 8 of the NVRA and to ensure that ineligible registrants are not on the voter rolls;

D.     Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees; and

E.     All other further relief that Plaintiffs may be entitled to.


Dated: December 5, 2025                          Respectfully submitted,

                                                 */s/ Cameron T. Norris*

                                                 Cameron T. Norris (DMD No. 21328)
                                                 Thomas R. McCarthy* (VA Bar No. 47145)
                                                 Gilbert C. Dickey* (VA Bar No. 98858)
                                                 Conor D. Woodfin* (VA Bar No. 98937)
                                                 1600 Wilson Boulevard, Suite 700
                                                 Arlington, VA 22209
                                                 (703) 243-9423
                                                 cam@consovoymccarthy.com
                                                 tom@consovoymccarthy.com
                                                 gilbert@consovoymccarthy.com
                                                 conor@consovoymccarthy.com

                                                 *Counsel for Plaintiffs*

                                                 **pro hac vice* applications forthcoming