# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JARED DEMARINIS, in his official capacity as State Administrator of Elections, *et al.*,<br><br>Defendants. | Civil Action No. SAG-25-3989 |

## MEMORANDUM IN SUPPORT OF DEMOCRATIC NATIONAL COMMITTEE'S MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Factual Background ...................................................................................................... 1

    I.      Voter Registration List Maintenance in Maryland ................................. 1

    II.    The Republican National Committee's Lawsuit ....................................... 4

Statutory Background .................................................................................................. 5

Legal Standard ............................................................................................................ 7

Argument ..................................................................................................................... 8

    I.      The NVRA Requires Only a Reasonable Effort to Remove Deceased
         Registrants and Ineligible Movers. ...................................................... 10

    II.    Registration Statistics Do Not Suggest That Mayland Has Failed to Make
         a Reasonable Effort to Remove Ineligible Movers and Deceased
         Registrants. ........................................................................................ 13

         A.    The RNC's Misaligned Statistics Do Not Support Its Claim. .............. 13

         B.    This Court May Take Judicial Notice of Properly Aligned
              Statistics. ................................................................................... 15

         C.    Registration Rates Below 100% Do Not Support Section 8(a)(4)
              Claims. ....................................................................................... 18

    III.   The RNC Has Failed to Plausibly Allege Maryland Does Not Make a
         Reasonable Effort to Remove Deceased Registrants. ............................ 19

    IV.   The RNC Has Failed to Plausibly Allege Maryland Does Not Make a
         Reasonable Effort to Remove Ineligible Movers. ................................. 22

Conclusion ................................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206 (4th Cir. 2019)................................ 7

*Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175 (3d Cir. 2017) ................................ 11, 12

*Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779 (W.D. Tex. 2015)................. 19

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .................................................. 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 7, 8, 10, 15

*Bellitto v. Snipes*, 221 F. Supp. 3d 1354 (S.D. Fla. 2016) ........................................................... 10

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) ............................................................. *passim*

*Brown v. Tarrant Cnty.*, 985 F.3d 489 (5th Cir. 2021) ................................................................ 21

*Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406 (1977)............................................................. 12

*Drouillard v. Roberts*, No. 1:24-cv-6969, 2024 WL 4667163 (N.D. Cal. Nov. 4, 2024) ............. 9

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) .................................................................... 7

*Fusaro v. Cogan*, 930 F.3d 241 (4th Cir. 2019) .................................................................... 8, 20

*Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708 (D. Md. 2023)............................................... 21

*Green v. Bell*, No. 3:21-cv-493, 2023 WL 2572210 (W.D.N.C. Mar. 20, 2023) ........................ 19

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) .......................................................................... 16

*Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564 (5th Cir. 2011)........................................ 16

*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018) .............................................. 6, 23, 24

*Iqbal v. Ashcroft*, 556 U.S. 662 (2008) ................................................................................. 7, 10

*Judicial Watch, Inc v. Ill. State Bd. of Elections*, No. 1:24-cv-1867, 2025 WL 2712209
   (N.D. Ill. Sept. 23, 2025) ....................................................................................................... 10

*Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091 (D. Colo. 2021)............................. 18, 19

*Judicial Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399 (M.D. Pa. 2021) ........................ 13, 19

*Katti v. Arden*, 161 F.4th 217 (4th Cir. 2025)............................................................................. 7

*League of United Latin Am. Citizens v. Abbott*, 617 F. Supp. 3d 622 (W.D. Tex. 2022)
(three-judge court) ................................................................................. 16

*League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-5174, 2020 WL 6269598
(W.D. Ark. Oct. 26, 2020) ........................................................................ 16

Md. Code Ann., Elec. Law § 3-102 ............................................................... 11, 14

*Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010) ..................................... 12

*Papasan v. Allain*, 478 U.S. 265 (1986) ........................................................... 7

*Pub. Int. Legal Found. v. Benson* ("*PILF v. Benson*"), 136 F.4th 613
(6th Cir. 2025), *petition for cert. pending*, No. 25-437 (filed Oct. 7, 2025) ............. 8, 13, 21, 22

*Rep. Nat'l Comm. v. Benson*, 754 F. Supp. 3d 773 (W.D. Mich. 2024), *aff'd*,
No. 24-1985, 2025 WL 2731704 (6th Cir. Sept. 25, 2025) .................................. 13

*Tellabs, Inc v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ........................ 16

*United States v. Cecil*, 836 F.2d 143 (4th Cir. 1988) ........................................ 15

*United States v. Weber*, No. 2:25-cv-9149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ............. 8

*Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612
(E.D.N.C. 2017) ........................................................................................ 19

*Whitcomb v. Chavis*, 403 U.S. 124 (1971) ......................................................... 12

*White v. Weiser*, 412 U.S. 783 (1973) ............................................................. 12

*Young v. Fordice*, 520 U.S. 273 (1997) ........................................................... 6

*Zack v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597 (4th Cir. 2015) .................. 8

## Statutes

52 U.S.C. § 20501 ................................................................................. *passim*

52 U.S.C. § 20503 ...................................................................................... 6

52 U.S.C. § 20504 ...................................................................................... 6

52 U.S.C. § 20505 ...................................................................................... 6

52 U.S.C. § 20506 ...................................................................................... 6

52 U.S.C. § 20507 ................................................................................. *passim*

52 U.S.C. § 20510 ................................................................................................... 4

52 U.S.C. § 21083 ................................................................................................. 23

52 U.S.C. § 21145 ................................................................................................. 12

Md. Code Ann., Elec. Law § 3-501 ................................................................... 2, 25

Md. Code Ann., Elec. Law § 3-502 ................................................... 3, 23, 24, 25

Md. Code Ann., Elec. Law § 3-503 ................................................................. 3, 25

Md. Code Ann., Elec. Law § 3-504 ................................................................. 2, 25

**Regulations**

Code Md. Regs. § 33.05.06.02 ............................................................................. 3

Code Md. Regs. § 33.05.06.03 ............................................................................. 3

Code Md. Regs. § 33.05.06.05 ............................................................................. 2

Code Md. Regs. § 33.05.07.01 ............................................................................. 2

Code Md. Regs. § 33.05.07.02 ............................................................................. 3

**Rules**

Fed. R. Evid. 201 .................................................................................................. 8

Fed. R. Evid. 902 ................................................................................................ 15

**Treatises**

Stephen Ansolabhere and Eitan Hersh, *Validation: What Big Data Reveal About Survey Misreporting and the Real Electorate*, 20 Political Analysis 437 (2012) ............................... 15

# INTRODUCTION

Maryland makes it easy for eligible citizens to register to vote, to stay registered, and to participate in elections. Maryland also regularly removes ineligible registrants from the rolls, including those who have died or moved. The Republican National Committee ("RNC") has nonetheless brought suit under Section 8(a)(4) of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507(a)(4), asking this Court to "ensure that ineligible registrants are not on the voter rolls." Compl. at 28, ECF No. 1. But Section 8(a)(4) requires only "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of the death of the registrant or a change in the residence of the registrant," not perfect removal of all ineligible registrants. Maryland easily meets this flexible standard.

The RNC's mixture of misleading statistics, vague allegations, and erroneous legal theories do not support an NVRA claim. A hodgepodge of administrative records and survey responses—misaligned over time—are inadequate. So are an outdated audit and complaints against policies subject to reasoned disagreement. And Maryland's decision to update the voter registration records of inter-county movers—rather than leaving outdated addresses on the rolls and placing eligible voters on the path to removal—is reasonable and aligns with the NVRA's statutory aims. *See* 52 U.S.C. § 20501(b)(2), (4). For these reasons and those that follow, this Court should dismiss the RNC's Complaint for failure to state a claim.

# FACTUAL BACKGROUND

## I.    Voter Registration List Maintenance in Maryland

The Maryland Election Law establishes a comprehensive voter registration regime, including voter registration list maintenance requirements. *See* Md. Code Ann., Elec. Law ("EL") §§ 3-101 to 3-602. Relevant here, Maryland law and regulations require election officials

to conduct a general program to remove registrants from the official list of eligible voters when they become ineligible by reason of death or a change in residence. *See id.* §§ 3-501 to 3-504; Code Md. Regs. ("COMAR") §§ 33.05.06.05, 33.05.07.01-.05.

Maryland law specifically authorizes removal of registered voters who are deceased. EL § 3-501(2)(ii). To facilitate these removals, the State Board of Elections ("SBE") obtains data from the Maryland Department of Health concerning the "names and residence addresses (if known) of all individuals at least 16 years of age reported deceased within the State" and from the Social Security Administration concerning "all Maryland residents at least 16 years of age who are reported deceased." *Id.* § 3-504(a)(1)(ii), (3). When official data from these sources or another state's vital statistics agency indicate that a Maryland registered voter is deceased, a local board must send a notice to the registration address and must remove the voter unless the voter or a representative of the voter objects and provides a substantive response within two weeks. *See id.* § 3-504(c)(2)(i), (iii); COMAR § 33.05.06.05(A); *see also* EL § 3-504(c)(2)(ii) (objection procedures). When a local board becomes aware by an obituary or any other reliable report of a death of a registered voter, the board must send a verification notice. EL § 3-504(c)(1)(i); COMAR § 33.05.06.05(B)(1). On receipt of a verification, the voter must be removed from the rolls. *See* EL § 3-504(c)(1)(ii); COMAR § 33.05.06.05(B)(2).

Maryland law also authorizes the removal of voters from the statewide voter registration list "if the voter has moved outside the State." EL § 3-501(3); *see also* COMAR § 33.05.07.01(A) (describing requirements "to periodically identify and, when appropriate, remove from the Statewide voter registration list individuals who have become ineligible by reason of a change of address to a jurisdiction outside Maryland"). Local election officials rely on "information provided by the postal service" and additional agencies to identify registered

voters who have moved to an address outside the state. EL § 3-502(c). Upon receipt of such information, an official must send the voter a statutory confirmation notice. *See id.*; COMAR § 33.05.07.02. Maryland law requires removal of the voter from the rolls if they confirm that they have changed residence to a location outside the State or do not respond to the notice and do not vote or appear to vote through the next two federal general elections. EL §§ 3-502(e), 3-503(c). During the waiting period between the mailing of a confirmation notice and removal of a voter, the voter is placed into "inactive status on the statewide voter registration list." *Id.* § 3-503(a). When a local election official receives information that "a voter currently registered in the State has moved to a different address *within* the State," the official must "change the voter's record and send the voter a confirmation notice." *Id.* § 3-502(b) (emphasis added); *see also* COMAR § 33.05.06.02. And when a voter requests to have their registration transferred to an address outside the State, that voter must be removed from the rolls. *See* COMAR § 33.05.06.03(A).

Based on these procedures, Maryland reported removing 264,617 registered voters from the rolls between the 2022 and 2024 federal general elections, including 88,132 deceased registrants and 168,181 registrants based on a change in residence. U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2024 Comprehensive Report* 185 (2025), https://perma.cc/TZJ5-S5FW [hereinafter *2024 EAVS*]. During this period, Maryland jurisdictions also sent address confirmation notices to 1,559,430 voters, or 36.9% of active voters (nearly twice the national average). *Id.* at 179–80. Maryland had 4,231,112 active registered voters on Election Day 2024, including 16- and 17-year-olds. *Id.* at 157; *see also* EL § 3-102(a)(1)(ii) (age qualification for registration). According to the 2024 U.S. Census American Community Survey ("ACS"), Maryland had approximately 4,471,244 citizens aged 18 and over

("CVAP") during 2024. *See* U.S. Census Bureau, *ACS 1-Year Estimates Detailed Tables, tbl. B05003 (Maryland)*, https://perma.cc/U3JD-9QVH.[1]

## II.    The Republican National Committee's Lawsuit

In July 2025, the Republican National Committee, the Maryland Republican Party, and affiliated individuals (collectively, "RNC") sent a letter to Jared DeMarinis, the Maryland State Administrator of Elections, providing written notice of an alleged NVRA violation. *See* Letter from Rep. Nat'l Comm., et al. to Jared DeMarinis, Md. State Admin. of Elections (July 18, 2025) ("July 18 Ltr."), ECF No. 1-2. The letter claimed that "Maryland and certain county officials are not conducting appropriate list maintenance to ensure that the voter registration roll is accurate and current, as required by federal law," and purported to serve as pre-suit notice under Section 11(b) of the NVRA, 52 U.S.C. § 20510(b). *Id.* at 2–3. To reach that conclusion, the RNC compared December 2023 voter registration statistics, the results of the 2022 U.S. Census Current Population Survey ("CPS"), population figures from the 2019-2023 U.S. Census American Community Survey ("ACS"), and a 2023 Audit Report. *See id.* at 1–2, 5-7 & attach. A. The RNC demanded that Maryland modify its list maintenance procedures to "identify and remove" all registrants "ineligible to vote by reason of a change in residence," "[d]eceased individuals," "[i]ncarcerated convicted felons," and "[a]ll other ineligible voters" or face litigation. *Id.* at 7.

On December 5, 2025, the RNC filed the instant litigation against the State Administrator of Elections, individual members of the SBE, individual members of the Howard County Board of Elections, and individual members of the Montgomery County Board of Elections. Compl.,

---

[1] CVAP stands for "Citizen Voting Age Population" and is the sum of adult native and naturalized residents, male and female.

ECF No. 1. The RNC generally alleges that "Maryland has failed to live up to the NVRA's requirements," claiming that at least two Maryland counties have more registered voters than citizens of voting age and that other counties have "suspiciously high rates of active voter registration." *Id.* ¶¶ 2–5, 88–90. The RNC arrives at its conclusions using a combination of 2024 voter registration data from the U.S. Election Assistance Commission Election Administration and Voting Survey ("EAVS"), 2023 ACS CVAP data, and 2024 CPS data. *See id.* ¶¶ 84–95. The RNC also claims that Maryland "likely has many noncitizens on its voter rolls" and that its voter files contain duplicate registrations. *Id.* ¶¶ 31–32, 112, 118–119.

Ultimately, the RNC presents only a single cause of action: "Violation of the NVRA." *Id.* at 27. Therein, the RNC alleges that "Defendants are failing to make reasonable efforts to conduct voter-list maintenance as required by 52 U.S.C. § 20507(a)(4)." *Id.* ¶ 145. Beyond a declaration that Defendants have violated the law and an injunction that they do not violate the law, the RNC seeks an order "instructing Defendants to develop and implement reasonable and effective registration list-maintenance programs to ensure their failure to comply with Section 8 of the NVRA and to ensure that ineligible registrants are not on the voter rolls." *Id.* at 28.

## STATUTORY BACKGROUND

In the National Voter Registration Act of 1993 ("NVRA"), Congress found that

> the right of citizens of the United States to vote is a fundamental right; it is the duty of the Federal, State, and local governments to promote the exercise of that right; and discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

52 U.S.C. § 20501(a)(1)-(3). The NVRA aims "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," to "enhance[] the participation of eligible citizens as voters in elections for Federal office," and "to ensure that

accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(1)–(2), (4). The lead

provisions of the NVRA address "procedures to register to vote in elections for Federal office"

and to update existing registration records. *Id.* § 20503(a); *see also id.* §§ 20504–06; *Husted v. A.*

*Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) ("The NVRA 'erect[s] a complex superstructure

of federal regulation atop state voter-registration systems.'" (alteration in original) (quoting

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 5 (2013)).

Section 8 of the NVRA sets "[r]equirements with respect to administration of voter

registration," 52 U.S.C. § 20507, establishing "just when, and how, States may remove people

from the federal voter rolls," *Young v. Fordice*, 520 U.S. 273, 276 (1997) (citing former 42

U.S.C. § 1973gg–6(a)(3), (4)). Section 8 primarily requires prompt processing of voter

registration applications and protects against removal from the official list of eligible voters in

federal elections. *See id.* § 20507(a)(1)–(3), (b)–(f). Section 8(a)(4) also imposes an affirmative

mandate that "each State shall conduct a general program that makes a reasonable effort to

remove the names of ineligible voters from the official lists of eligible voters by reason of the

death of the registrant or a change in the residence of the registrant, in accordance with

subsections (b), (c), and (d)." *Id.* § 20507(a)(4). Among those referenced subsections, Section

8(c)(1) allows states to meet the "reasonable effort" requirement with respect to movers by

following specified procedures: (A) using U.S. Postal Service change-of-address information to

identify registrants whose address may have changed, (B)(i) updating the registration

information of movers within the jurisdiction of a single registrar, and (ii) using a statutory

confirmation and removal process for registrants who move between registrars' jurisdictions. *See*

*id.* § 20507(c)(1). Section 8(c)(2) requires states to complete "any program the purpose of which

is to systematically remove the names of ineligible voters from the official lists of eligible

voters" not later than 90 days before a Federal primary or general election. *Id.* § 20507(c)(2).

Section 8(d)(1) prohibits states from removing registrants from the rolls based on a change of address unless the registrant either: (A) "confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered" or (B) both fails to (i) respond to a statutory notice and fails to vote *and* (ii) fails to appear to vote through "the date of the second general election for Federal office that occurs after the date of the notice." *Id.* § 20507(d)(1); *see also id.* § 20507(d)(2) (defining notice).

## LEGAL STANDARD

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). A complaint must be dismissed where it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While courts must view a complaint in the light most favorable to the plaintiff, they need not accept legal conclusions as factual allegations. *See id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*; *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) ("The plausibility standard requires a plaintiff to demonstrate more than a sheer possibility that a defendant has acted unlawfully." (internal citation and quotation marks omitted)). The plausibility standard is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2008); *see also Katti v. Arden*, 161 F.4th 217, 224 (4th Cir. 2025) (recognizing that this standard applies "to *each* claim against *each* defendant in a civil action").

At the motion-to-dismiss phase, courts must assume "that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. Courts may also "consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (internal quotation marks and citation omitted). Finally, courts may "consider facts and documents subject to judicial notice without converting the motion to dismiss into a motion for summary judgment." *Zack v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015); *see also* Fed. R. Evid. 201(b) (allowing judicial notice of facts "generally known" or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

## ARGUMENT

The RNC has failed to plausibly plead that Defendants do not "conduct a general program that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voter" by reason of death or change of address. 52 U.S.C. § 20507(a)(4) (emphasis added). A "reasonable effort" is "a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson* ("*PILF v. Benson*"), 136 F.4th 613, 625 (6th Cir. 2025), *petition for cert. pending*, No. 25-437 (filed Oct. 7, 2025). "The failure to use duplicative tools or to exhaust every conceivable mechanism does not make [an] effort unreasonable." *Bellitto v. Snipes* ("*Bellitto II*"), 935 F.3d 1192, 1207 (11th Cir. 2019); *see also, e.g.*, *United States v. Weber*, No. 2:25-cv-9149, 2026 WL 118807, at *13 (C.D. Cal. Jan. 15, 2026) (recognizing Section 8(a)(4) turns on "states' policies regarding reasonable voter rolls maintenance," not "line-by-line voter roll data").

Maryland has a comprehensive set of voter registration list maintenance laws and regulations. *See* EL §§ 3-501 to 3-504; COMAR §§ 33.05.06.05, 33.05.07.01-.05; *see also* Section II.A, *supra*. Pursuant to those procedures, Maryland registrars removed 264,617 registered voters from the rolls between the 2022 and 2024 federal general elections, including 12,292 in Howard County and 55,701 in Montgomery County. *2024 EAVS* at 185; Election Assistance Comm'n, *Election Administration and Voting Survey: EAVS Dataset Version 1.0*, column A12a (2025), https://www.eac.gov/research-and-data/studies-and-reports [hereinafter *2024 EAVS Dataset*].[2] Although "Congress could have required more, and perhaps other procedures would be even more effective," Section 8(a)(4) requires only a "reasonable effort." *Bellitto II*, 935 F.3d at 1205; *see also, e.g.*, *Drouillard v. Roberts*, No. 1:24-cv-6969, 2024 WL 4667163 at *10 (N.D. Cal. Nov. 4, 2024) (noting that plaintiffs failed to meet their burden of establishing why existing procedures are not reasonable). The RNC fails to plausibly allege that Maryland's procedures are not reasonable. Because Maryland statutes and regulations establish a general program that makes a reasonable effort to remove registered voters who have become ineligible based on death or a change of address, this Court should grant the DNC's Motion to Dismiss.

Nor has the RNC alleged that Maryland fails to follow its own procedures to remove ineligible voters; the RNC simply wants Maryland to purge more registered voters from the rolls. *See* Compl. ¶¶ 83–122. The RNC's failure to plead that Maryland registrars do not follow state procedures defeats the claim. *Cf. Bellitto v. Snipes* ("*Bellitto I*"), 221 F. Supp. 3d 1354, 1365

---

[2] County-level data are available by selecting "2024" under "EAVS Reports and Materials by Reporting Year" and then clicking a link for the preferred data format next to "EAVS Datasets Version 1.0." Data may be filtered using "MARYLAND" in the "State_Full" column (Column C) to easily find Howard County and Montgomery County data. Column definitions are separately available in the "EAVS: Data Codebook" on the same webpage.

(S.D. Fla. 2016) (denying motion to dismiss based on specific allegation that jurisdiction did not implement state law); *Judicial Watch, Inc v. Ill. State Bd. of Elections*, No. 1:24-cv-1867, 2025 WL 2712209, at *12 (N.D. Ill. Sept. 23, 2025) (relying on 23 counties reporting 15 or fewer removals each over two years).

The RNC's specific allegations concerning voter registration and list maintenance in Maryland do not "nudge[] [their] claims . . . across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570). First, the RNC sets out a series of allegations concerning incarcerated individuals with felony convictions, noncitizens on the rolls, and duplicate registration records, *see* Compl. ¶¶ 6, 15, 31–32, 69, 112, 118–19, none of which are relevant under Section 8(a)(4). Second, the RNC alleges that voter registration rates in Maryland are "improbably high," *id.* ¶¶ 83–98, but a closer examination of the underlying statistics—and the methods for calculating the statistics alleged in the Complaint—reveals that the RNC's allegations are deficient in several respects. Third, the RNC alleges that Maryland has not taken specific measures to identify and remove deceased registrants, *see* Compl. ¶¶ 112–21, but ignores actual practices set out in the Audit Report attached to the Complaint and ignores discretion inherent in the "reasonable effort" standard, 52 U.S.C. § 20507(a)(4). Fourth, the RNC alleges that Maryland has failed to implement particular list maintenance practices to place possible movers on the path to removal, *see* Compl. ¶¶ 99–111, but these practices either do not target "ineligible voters" or are not required to meet the "reasonable effort" standard.

I.    **The NVRA Requires Only a Reasonable Effort to Remove Deceased Registrants and Ineligible Movers.**

In addressing the RNC's claim, this Court should first discount the irrelevant allegations. Section 8(a)(4) of the NVRA sets out an affirmative voter registration list mandate, but that mandate requires only a "reasonable effort" to remove duly registered voters who have become

ineligible based upon death or change of address. 52 U.S.C. § 20507(a)(4); *see also, e.g.*, *Bellitto II*, 935 F.3d at 1200 ("[T]he text unambiguously mandates that the states maintain a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" only two things: death or change of address." (quoting 52 U.S.C. § 20507(a)(4)); *Am. C.R. Union v. Phila. City Comm'rs* ("*ACRU*"), 872 F.3d 175, 182–83 (3d Cir. 2017) ("By its terms, the mandatory language in Section 8(a)(4) only applies to registrants who have died or moved away."). Indeed, the RNC acknowledges as much in its Complaint. *See* Compl. ¶¶ 64, 66. Because the RNC alleges only a violation of Section 8(a)(4) of the NVRA, this Court should disregard portions of the Complaint unrelated to deceased registrants and ineligible movers.

The RNC cannot use its NVRA claim as a vehicle to address removal of registrants who are ineligible for reasons other than death or residency, let alone database errors. The RNC claims that Maryland "likely has many noncitizens on its voter rolls today," *id.* ¶ 32, but the Complaint identifies only a single noncitizen registrant and alleges only that he "was" once on the voter rolls, *id.* ¶ 31. The Complaint includes allegations concerning "the removal of individuals . . . rendered ineligible under state law due to a felony conviction," *id.* ¶ 69, but the NVRA does not affirmatively mandate removal based on felony convictions, even during periods of temporary disenfranchisement under state law, *see ACRU*, 872 F.3d at 187; *see also* EL § 3-102(b)(1), (3). Similarly, the RNC alleges that Maryland's voter rolls are littered with duplicate entries, *see* Compl. ¶¶ 112, 118–19, but the NVRA does not address database management, *see* 52 U.S.C. § 20507. Therefore, these allegations are irrelevant to a Section 8(a)(4) claim and should not be considered when assessing the sufficiency of the Complaint.

The RNC also cannot use its NVRA claim as a platform to allege violations of the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. §§ 20901–21145. HAVA does not "broaden[] the scope of the NVRA's list-maintenance obligations." *Bellitto II*, 935 F.3d at 1202; *see also ACRU*, 872 F.3d at 184–85 (similar); 52 U.S.C. § 21145(a)(4) (directing that nothing in HAVA supersedes the NVRA). Yet the RNC lays out purported list-maintenance obligations under HAVA in its Complaint as if alleged violations of these standards provide the basis for a legal claim. *See* Compl. ¶¶ 67–69, 113. But the RNC only brings a claim under the NVRA, *see* Compl. at 27–28, rendering allegations about HAVA obligations irrelevant to this litigation.

Ultimately, the RNC cannot use Section 8(a)(4) of the NVRA to stage a takeover of Maryland's voter registration system. *See, e.g.*, *White v. Weiser*, 412 U.S. 783, 793–97 (1973) (barring "intru[sion] upon state policy any more than necessary" when remedying defects in electoral systems (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971)). Even if this Court were ultimately to enter judgment for the RNC—and it should not even proceed beyond the pleading stage—this Court must "tailor the scope of the remedy to fit the nature and extent of the . . . violation." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288–89 (4th Cir. 2010) (quoting *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977)). Thus, the RNC cannot obtain relief unrelated to deceased registrants and registrants who have become ineligible to vote based on a change of address, and this Court should disregard the RNC's request to require a program that would "ensure that ineligible registrants are not on the voter rolls." Compl. at 28; *see also* July 18 Ltr. at 7 (indicating that Maryland could avoid litigation only by identifying and removing "[a]ll . . . ineligible voters"). This demand "flips the statutory mandate" to ensure that any eligible applicant is registered to vote "on its head" and must be rejected. *Rep. Nat'l Comm. v.*

*Benson* ("*RNC v. Benson*"), 754 F. Supp. 3d 773, 793 (W.D. Mich. 2024), *aff'd*, No. 24-1985, 2025 WL 2731704 (6th Cir. Sept. 25, 2025) (addressing and rejecting identical prayer for relief).

## II.    Registration Statistics Do Not Suggest That Mayland Has Failed to Make a Reasonable Effort to Remove Ineligible Movers and Deceased Registrants.

Rather than focus on Maryland's actual policies and practices, the RNC's principal allegation is that there are too many voters on the Maryland voter file, so something must be wrong with Maryland's list maintenance program, even if the RNC does not know what it is. Compl. ¶¶ 85–98. This "variation of *res ipsa loquitur*" fails to allege a "specific breakdown" in the list maintenance program and is insufficient to state a plausible claim under Section 8(a)(4). *RNC v. Benson*, 754 F. Supp. 3d at 791–92. The NVRA does not impose "quantifiable, objective" metrics on state list maintenance programs, a standard untethered from the plain language of the statute. *PILF v. Benson*, 136 F.3d at 626. Moreover, merely alleging that voter registration rates are "abnormally high" does not afford plausibility to a blanket allegation of the failure to perform reasonable list maintenance, *Judicial Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399, 408 (M.D. Pa. 2021), in part because increasing voter registration and democratic participation are explicit aims of the NVRA, *see* 52 U.S.C. § 20501(b)(1)–(2).

### A.    The RNC's Misaligned Statistics Do Not Support Its Claim.

In any case, the RNC's allegations fail because they are based on misaligned statistics, a set of apples-to-oranges-to-bananas comparisons. *See, e.g.*, *RNC v. Benson*, 754 F. Supp. at 792 (dismissing claim based on registration and population data from different years). Take for instance the RNC's allegation that at the end of 2024, Maryland had a "improbably high" active registration rate of 96%. Compl. ¶¶ 85–87; *see also 2024 EAVS* at 157. The RNC repeats this allegation twice, using November 2024 and December 2024 registration data as the numerator. *See* Compl. ¶¶ 85–87; *see also EAVS Report* at 6 (describing EAVS data collection). Under

Maryland law, these totals include 16- and 17-year-old pre-registrants. *See* EL § 3-102(a)(1)(ii). These figures also represent the statistical peak of registration, at the end of a 90-day pre-election period when voters continue to register but most list maintenance is prohibited. *See* 52 U.S.C. § 20507(c)(2); *see also Bellitto II*, 935 F.3d at 1208 (describing this time as "the high point in a [jurisdiction's] number of registered voters, compared to almost any other time in a two-year cycle"). The RNC's denominator does not align with numerator for three distinct reasons. First, the RNC divides registration by CVAP—citizens age 18 and up—which omits 16- and 17-year-olds. *See 2024 EAVS* at 6. Second, the RNC divides registration by 2023 ACS data rather than 2024 data. *See id.* at x, 6, 132; *see also id.* at x (noting that 2024 ACS data were not available at the time of EAVS publication). Third, registration is divided by a period estimate incorporating "12 months of data," rather than a point estimate near the end of the year. Compl. ¶ 84. Indeed, the EAVS Report warns, "Some states may have reported more active registered voters than CVAP because the 2023 CVAP is being compared to 2024 data." *2024 EAVS* at x. The RNC asks this Court to presume that the 96% Maryland active voter registration rate reported in the 2024 EAVS lends plausibility to a claim of unreasonable list maintenance. Compl. ¶ 98. It does not. *See Bellitto II*, 935 F.3d at 1208–09 (affirming rejection of misaligned statistics).

**Table 1: EAVS Data Comparison**

|  | Voter Registration | Eligible Voter Population |
|---|---|---|
| **Age** | 16+ | 18+ |
| **Year** | 2024 | 2023 |
| **Date** | November 5 | Full Year |

The RNC's use of CPS data as support for its claim fares no better. The RNC points to "U.S. Census Bureau" voter registration estimates and alleges that "Maryland and its counties

are significant statistical outliers, touting voter registration rates 25 to 30 percentage points higher than the national figures from 2024, 2022, and 2020." Compl. ¶¶ 91–94.[3] This allegation is not merely "doubtful in fact," *Twombly*, 550 U.S. at 555, it is actively misleading. By comparing *actual* Maryland voter registration data to survey questions asking whether respondents *believe* they are registered to vote, the RNC generates a disparity present in the vast majority of states. While the 2024 CPS estimated that 73.6% of eligible voters are registered nationwide, Compl. ¶ 91, the 2024 EAVS estimated nationwide active registration at 86.6%, and the 2024 EAVS estimated that only four states had below 75% registration rates, *2024 EAVS* at 156–60. Thus, the RNC's allegations only identify the nationwide gap between actual and self-reported voter registration. *See, e.g.*, Stephen Ansolabehere and Eitan Hersh, *Validation: What Big Data Reveal About Survey Misreporting and the Real Electorate*, 20 Political Analysis 437 (2012), https://perma.cc/Z73G-GNMR. Highlighting the Maryland-specific disparity between these data sources lends no plausibility to the RNC's claim.

### B. This Court May Take Judicial Notice of Properly Aligned Statistics.

The burden rests on the RNC to offer registration statistics that support its allegations, but this Court may also take judicial notice of Census data confirming that the RNC's statistical allegations do not support the plausibility of their ultimate allegation. Courts routinely take judicial notice of "official governmental reports and statistics" on population and voter registration. *United States v. Cecil*, 836 F.2d 1431, 1452 (4th Cir. 1988) (citing Fed. R. Evid. 902(5))); *see also, e.g.*, *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571–72 (5th Cir.

---

[3] These are CPS voting and registration data, the results of a biennial spot survey appended to the monthly CPS labor force questionnaire. *See* July 18 Ltr. at 1, 5–6 (identifying data as CPS results); U.S. Census Bureau, *Current Population Survey, November 2024 Voting Supplement File*, https://perma.cc/T7GC-KBFR (documentation); *see also* U.S. Census Bureau, *Voting and Registration in the Election of November 2024*, https://perma.cc/TCZ6-ZS6F (data tables).

2011) ("United States census data is an appropriate and frequent subject of judicial notice.").

This includes ACS CVAP estimates, *see, e.g.*, *League of United Latin Am. Citizens v. Abbott*,

617 F. Supp. 3d 622, 630–31 & n.2 (W.D. Tex. 2022) (three-judge court), and EAVS data, *see,*

*e.g.*, *League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-5174, 2020 WL 6269598, at *4

n.2 (W.D. Ark. Oct. 26, 2020). Indeed, the Complaint specifically alleges that "U.S. Census

Bureau's American Community Survey is one of the most accurate, up-to-date estimates of

citizen voting age population (CVAP) available," and the core allegations integrate these data

sources. Compl. ¶¶ 84, 87, 89, 108, 120. Thus, ACS CVAP data and EAVS data are appropriate

subjects of judicial notice, even on a motion to dismiss. *See, e.g.*, *Hall v. Virginia*, 385 F.3d 421,

424 & n.3 (4th Cir. 2004) (taking judicial notice of public statistics omitted from complaint

offering incomplete data); *see also Tellabs, Inc v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

322 (2007) (authorizing consideration of "documents incorporated into the complaint by

reference[] and matters of which a court may take judicial notice").

Properly aligned data subject to judicial notice establish that Maryland's active voter

registration rate is well below the 96% rate alleged. The 2024 ACS estimated that Maryland had

approximately 4,471,244 citizens aged 18 and over during 2024, and Maryland had 4,231,112

active registered voters on Election Day 2024, including 16- and 17-year-olds, as noted above.

*ACS 1-Year Estimates Detailed Tables, tbl. B05003 (Maryland)*, *supra*; *2024 EAVS* at vi; *cf. id.*

(reporting 2023 ACS Maryland CVAP estimate of 4,411,478). Thus, the ratio declines to 94.6%

merely by using CVAP estimates from the same year as the voter registration statistics.

Moreover, the increase in CVAP from 2023 to 2024 estimates suggests an ongoing population

trend during 2024, such that comparing November 2024 registration statistics to a 2024 yearlong

population estimate underestimates the population at the time of reported registration and

produces an inflated registration rate. Even this lower rate does not take into account 16- and 17-year-olds present in registration figures but not in CVAP data. According to data relied upon by the RNC in the notice letter attached to its Complaint, there were 52,510 active pre-registrants on the Maryland voter rolls at the end of 2023, making up 1.24% of active registered voters. *See* Laura W. Brill et al., *Maryland Registers 64% of 18-Year-Olds to Vote, More Reforms Needed to Close the Gap*, Center for Democracy and Civic Engagement (Sept. 17, 2024), https://perma.cc/JB2M-6Q5J (cited in July 18 Ltr. 6 n.14). Removing those pre-registrants from total registration allows for a comparison of adult registration to CVAP. This yields a statewide 93.5% registration rate. This figure is above national averages, but the RNC has alleged that voter turnout in Maryland above national averages as well. *See* Compl. ¶ 95.[4]

Considering the most recent available CVAP data also provides a more accurate picture of registration rates in Howard County and Montgomery County, the two counties the RNC alleges "record more active registered voters than voting-eligible citizens." Compl. ¶ 88. Howard County had 234,246 citizens aged 18 and over during 2024 and 236,961 active registered voters on Election Day 2024, including 16- and 17-year-olds. *See* U.S. Census Bureau, *ACS 1-Year Estimates Detailed Tables*, *tbl. B05003 (Howard County)*, https://perma.cc/NE2W-YMFM; *2024 EAVS Dataset*, column A1b. This reduces the alleged registration rate of 103.3% down to 101.1%, without taking into account population trends during 2024. Removing 1.24% of

---

[4] The RNC cannot counter Maryland's actual increase in CVAP over time merely by alleging that one source of population change—domestic migration—has not contributed to the increase. *See* Compl. ¶ 96. Young citizens reaching majority, naturalization, and the return of citizens from abroad also contribute to CVAP increases. The RNC also cannot simply allege away the existence of 16- and 17-year-olds on the rolls. *See id.* ¶ 97. It is implausible to allege that this group does not further reduce registration rates. *See* July 18 Ltr. at 6 (acknowledging 16- and 17-year-olds make up more than 1% of registration).

registrants to account for pre-registrants yields a 99.9% registration figure. *See* Brill et al., *supra* (reporting Howard County has above-average pre-registration).

Similarly, Montgomery County had 703,932 citizens aged 18 and over during 2024 and 695,162 active registered voters on Election Day 2024, including 16- and 17-year-olds. *See* U.S. Census Bureau, *ACS 1-Year Estimates Detailed Tables*, *tbl. B05003 (Montgomery County)*, https://perma.cc/7VMM-AFAQ; *2024 EAVS Dataset*, column A1b. This reduces the alleged registration ratio of 100.2% down to 98.8%, again without taking into account population trends during 2024. Removing 1.24% of registrants to account for pre-registrants yields a 97.6% registration figure. *See* Brill et al., *supra* (reporting Montgomery County has above-average pre-registration).

**Table 2: Registration Rates Using 2024 Registration and Population Data**

|  | RNC Allegation | 2024 Data | 2024 Data without Pre-Registrants |
|---|---|---|---|
| **Maryland** | 95.9% | 94.6% | 93.5% |
| **Howard County** | 103.3% | 101.1% | 99.9% |
| **Montgomery County** | 100.2% | 98.8% | 97.6% |

### C.    Registration Rates Below 100% Do Not Support Section 8(a)(4) Claims.

Even if this Court were to accept that registration rates alone can carry a complaint past a motion to dismiss—and it should not—the statistics set out above confirm that the RNC has failed to state a plausible claim. Some courts addressing the adequacy of allegations in a Section 8(a)(4) suit have concluded that "a registration rate in excess of 100% may be an indicator of a jurisdiction not making a reasonable effort to conduct a voter list maintenance program in accordance with the NVRA." *Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1107 (D. Colo. 2021); *see also Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 793–94

(W.D. Tex. 2015). Statewide claims have been deemed plausible when numerous counties are alleged to have registration rates above 100%. *See Green v. Bell*, No. 3:21-cv-493, 2023 WL 2572210, at *5 (W.D.N.C. Mar. 20, 2023) (nine counties); *Griswold*, 554 F. Supp. 3d at 1097 (40 counties). In this case, the RNC alleges that only two counties have registration rates above 100%, and both allegations are fatally undercut by public data subject to judicial notice. *Cf., e.g.*, *Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 620 (E.D.N.C. 2017) (denying motion to dismiss because allegation "that the number of registered voters in Wake County has exceeded, and continue[d] to exceed, the number of eligible voters" was "in turn supported by reliable data"). Once this Court considers the relevant statistics, no defendant jurisdiction has a statistically impossible registration rate. "Registration rates *below* 100 percent, without more, simply do not permit" an inference "that there might be a list-maintenance problem." *Judicial Watch v. Pennsylvania*, 524 F. Supp. 3d at 408. Moreover, the RNC has alleged that Maryland registration records include duplicates, which would also account for above-average registration rates. *See* Compl. ¶¶ 112, 118–19. Thus, registration data in Maryland do not support the plausibility of the RNC's general claim against Maryland's efforts to remove registrants who have become ineligible based on death or change of residence.

## III.    The RNC Has Failed to Plausibly Allege Maryland Does Not Make a Reasonable Effort to Remove Deceased Registrants.

The specific practices the RNC alleges to support its general claim of insufficient list maintenance based on voter deaths are either out-of-date or entirely reasonable. The database matching protocols at issue in the 2023 Audit Report are not only unnecessary to meet the "reasonable effort" standard, but they are no longer in place. *See* Compl. ¶¶ 112–18; *see also* Md. Office of Legislative Audits, *Audit Report: State Board of Elections* (Oct. 2023) [hereinafter *2023 Audit Report*], ECF No. 1-1. Moreover, the recent policy change to which the RNC only

vaguely alludes in its Complaint, *see* Compl. ¶ 121, is a rational prohibition on list maintenance using third-party websites that purport to compile obituaries. Md. State Bd. of Elections, *SBE Policy 2025-02: Obituary Policy*, https://perma.cc/FUT2-SZRB. Defendants' "reliance on reliable death records, such as state health department records and the Social Security Death Index, to identify and remove deceased voters constitutes a reasonable effort" that satisfies their obligations under the NVRA. *Bellitto II*, 935 F.3d at 1205.

The RNC cannot base allegations of an "ongoing, systematic, and uncorrected deficiencies in the state's list-maintenance practices" on the 2023 Audit Report. Compl. ¶ 112. The RNC attached the Audit Report to the Complaint, and so this Court may consider its contents, rather than the Complaint's description thereof. *See Fusaro*, 930 F.3d at 248. As an initial matter, the Audit Report reflects procedures and records no longer in place. The Report suggested that less precise matching algorithms between death records and voter registration records (*i.e.*, "fuzzy" matching) could identify additional deceased voters. *2023 Audit Report* at 10. However, the Report also indicates that Maryland responded to this suggestion by implementing "changes to the matching process to include non-exact matches on first or last name" and "a manual 'fuzzy match' analysis on deceased residents not matched to registered voters. *Id.* app. A at 3. The Audit Report also identified only "2,426 potentially deceased individuals with active voter registration" out of 4,4148,651 active registered voters at the time of the audit, a 0.05% error rate. *Id.* at 10–11. But the SBE did not simply leave those voters on the rolls. The Board instead undertook a "process to review all 2,426 records" and ultimately removed the deceased registrants among them. *Id.* app. A at 2. Even if these voters currently remained on the rolls—and there is no allegation that they do—this is not an indication that Defendants have failed to put forth a "reasonable effort" to remove deceased registrants. To the

contrary, the Sixth Circuit in *PILF v. Benson* held that identification of 27,000 deceased voters

on the rolls, "0.3 percent of the total number of registered voters," was such a "vanishingly small

percentage" that it was "indicative [of] rational, sensible steps to maintain accurate voter rolls."

136 F.4th at 628.[5] Ultimately, a "reasonable effort" need not include fuzzy matching of death

records, which may misidentify registrants as deceased, resulting in their immediate removal and

potential disenfranchisement. *See 2024 Audit Report* app. A, at 2 (noting that "three of the

potentially deceased voters" identified by auditors "were not deceased"); *see also, e.g.*,

Settlement Agreement ¶ 9, *Tex. League of United Latin Am. Voters v. Whitley*, No. 5:19-cv-72

(W.D. Tex.), https://perma.cc/DSJ7-9QSC (mandating precise matching to address purge list that

misidentified tens of thousands of Americans as non-citizen registrants).

 The RNC's final allegation concerning death removals would be laughable, were the

fundamental right to vote not at stake. The RNC specifically alleges that Defendants are not

conducting reasonable list maintenance because they "recently enacted an official policy"

restricting "the types of source materials" registrars "can use to cancel registrations of deceased

voters." Compl. ¶ 121. This Court may take judicial notice of public "policy documents"

reflecting an official government position, such as policy to which the RNC alludes. *Gaines v.

Balt. Police Dep't*, 657 F. Supp. 3d 708, 733 (D. Md. 2023); *see also, e.g.*, *Brown v. Tarrant

Cnty.*, 985 F.3d 489, 493 & n.5 (5th Cir. 2021). The actual policy authorizes local boards of

---

[5] This is particularly true with respect to individuals who "died in Maryland but listed another state as their residence on their death certificate." *2023 Audit Report* app. A, at 2. Plaintiffs allege that the SBE "made no effort to acquire more comprehensive data," Compl. ¶ 116, but the 2023 Audit Report indicates that the SBE cannot obtain the data due to Maryland Department of Health policy, *2023 Audit Report* app. A, at 2. The Audit identified only 761 registration records impacted by this issue. *2023 Audit Report* app. A, at 2; *see also* Compl. ¶ 117 (describing these residents as "resid[ing] outside of the state when they died"). They made up a minute fraction of the rolls in 2023, and none remain registered.

elections to conduct list maintenance using newspaper obituaries or funeral home announcement

but prohibits reliance on third-party websites, "such as Ancestry.com or Legacy.com." *SBE*

*Policy 2025-02: Obituary Policy*, *supra*. This is a quintessential policy choice the NVRA

reserves to the states. *See, e.g.*, *PILF v. Benson*, 136 F.4th at 626 ("The state is not required to

exhaust all available methods for identifying deceased voters; it need only use reasonably

reliable information to identify and remove such voters." (quoting *Bellitto II*, 935 F.3d at 1205)).

Therefore, these allegations fail to state a claim for violations of the NVRA.

## IV.    The RNC Has Failed to Plausibly Allege Maryland Does Not Make a Reasonable Effort to Remove Ineligible Movers.

The RNC's general allegation that Defendants fail to conduct a reasonable effort to

remove registrants who have become ineligible based on a change of address is a challenge to

two lawful practices: (1) updating the registration records of intercounty movers; and (2)

declining to consider mail returned as undeliverable as evidence of a voter's change of address.

Neither lends plausibility to the conclusory allegation of "a total lack of 'reasonable efforts' to

remove registrants" who have become ineligible based on a change of address. Compl. ¶ 111.

The RNC's principal target is Maryland's practice of updating the registration records of

voters who move between counties, rather than leaving them registered at their former address

and placing them on the path to removal. Compl. ¶¶ 100–07. It is true that Section 8's Safe

Harbor Provision establishes that a "State *may* meet the requirement" of Section 8(a)(4) by

establishing a program that uses Postal Service change-of-address information to identify

potential movers and then: (1) update the registration of voters who move within the jurisdiction

of a single registrar: and (2) begin the removal process for voters who have "moved to a different

residence address not in the same registrar's jurisdiction." 52 U.S.C. § 20507(c)(1) (emphasis

added); *see also* Compl. ¶ 100 (noting States "can meet the 'reasonable effort' requirement"

using this procedure). But the RNC fundamentally errs by alleging that the procedures that "inactivate and eventually remove suspected inter-county voters" are "the NVRA's process" and a "mandatory" statutory directive. Compl. ¶¶ 104, 106–07. The Safe Harbor Provision is only "one option" to satisfy Section 8(a)(4). *Husted*, 584 U.S. at 763–64.

In fact, the NVRA and HAVA together suggest that Maryland's twin procedures of updating the registration records of intercounty movers and placing interstate movers on the path to removal make up "a reasonable effort to remove the names of *ineligible* voters" based on change of address. 52 U.S.C. § 20507(a)(4). The Safe Harbor Provision represents a Congressional judgment that it is reasonable to update voter registration records within a single voter registration list and to begin removal where voters appear to no longer be eligible to remain on that list. *See id.* § 20507(c)(1). Nine years after Congress enacted the NVRA, Congress passed HAVA, which required states to consolidate county voter registration lists into "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State." *Id.* § 21083(a)(1)(A); *cf. id.* § 20507(j)(2) (NVRA provision anticipating that a "registrar's jurisdiction" may encompass a "unit of government that governs a larger geographic area than a municipality"). Maryland now takes advantage of its statewide database by updating registration information when voters remain eligible to vote in the State but move between counties, rather than leaving outdated data on the rolls and forcing intercounty movers to reregister. *See* EL § 3-502(b). Regardless of whether this fits neatly into the Safe Harbor Provision, it is a reasonable procedure that furthers the aims of the NVRA, as it both "enhances the participation of eligible citizens as voters in

elections for Federal office" and helps "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(2), (4).

The RNC further errs by suggesting that confirmation notices Maryland registrars send to intercounty movers must be notices that begin the process of removal from the rolls. Compl. ¶¶ 105, 107. The Safe Harbor Provision envisions that voters who move within the jurisdiction of a single registrar will receive "a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information," not the notice described in Section 8(d)(2) of the NVRA that begins the removal process. 52 U.S.C. § 20507(c)(1)(B)(i)–(ii). Maryland provides a similar "confirmation notice" to any mover within the State. *See* EL § 3-502(a)–(b) (requiring provision of a "a postage prepaid and preaddressed card on which the voter may report the voter's current address"). "[F]ederal law makes . . . removal mandatory" after a voter receives a Section 8(d)(2) notice and neither votes nor appears to vote for two election cycles. *Husted*, 584 U.S. at 767; *see also* Compl. ¶ 107. Because the Maryland "confirmation notice" is not a Section 8(d)(2) notice, it does not trigger mandatory removal. *See* 52 U.S.C. § 20507(d)(2) (requiring warning of possible removal).

Finally, the SBE's decade-old decision not to treat mail returned as undeliverable as evidence of ineligibility based on a change of address does not support the RNC's general allegation of unreasonable list maintenance efforts. *See* Compl. ¶ 111. Here, the RNC once again takes issue with a policy choice permitted under the NVRA's flexible standard. According to the U.S. Postal Service Domestic Mail Manual, there are eight reasons why a mail piece might be returned as undeliverable, only two of which may be related to a voter's eligibility to vote based on a change of address. *See* U.S. Postal Serv., *Domestic Mail Manual* § 507-1.1, https://perma.cc/YFV9-GTBM. Moreover, U.S. Election Assistance Commission guidance

recognizes that mail sent to eligible voters—including absentee ballots—may be returned as undeliverable. *See* U.S. Election Assist. Comm'n, *The Importance of Accurate Voter Data When Expanding Absentee or Mail Ballot Voting* 1 (2020), https://perma.cc/GFL6-37XN (describing "ballots to be returned as undeliverable" as "a normal part of the process"). Thus, the Election Assistance Commission has indicated that jurisdictions "should consider whether and how mailings or ballots returned as undeliverable can be used for list maintenance purposes." *Id.* at 2. Based on this guidance delegating policy choices to the States, it cannot be that the RNC's preferred treatment of undeliverable mail is the only reasonable or legally permissible path.

*          *          *

The RNC sets out myriad complaints and critiques in its Complaint but makes no meaningful allegations against Maryland's core voter registration list maintenance activities that state a claim for violation of the NVRA. Maryland removes deceased registrants using data from the Maryland Department of Health and the Social Security Administration, along with obituaries, funeral home notices, and other sources. *See* EL §§ 3-501, 3-504. Maryland also removes voters who move out of the state using Postal Service and other agency data, while updating the registration address of eligible voters who move within the State. *See* EL §§ 3-501 to 3-503. Under the flexible "reasonable effort" standard, these procedures meet baseline federal requirements. As a result, the RNC has not plausibly alleged a failure to comply with Section 8(a)(4) of the NVRA.

## CONCLUSION

For the reasons set forth above, this Court should dismiss the Complaint for failure to state a claim upon which relief can be granted.

Dated: January 30, 2026

Respectfully submitted,

/s/ Monica R. Basche
Andrew D. Levy (Fed. Bar No. 00861)
Monica R. Basche (Fed. Bar No. 20476)
Brown Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, MD 21202
Phone: 410-962-1030
Fax: 410-385-0869
adl@browngold.com
mbasche@browngold.com

/s/ Daniel J. Freeman
Daniel J. Freeman (*pro hace vice*)
Democratic National Committee
430 South Capitol Street SE
Washington, DC 20003
Phone: 202-863-8000
Fax: 202-863-8063
freemand@dnc.org

*Counsel for Proposed Defendant-Intervenor
Democratic National Committee*