**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| REPUBLICAN NATIONAL COMMITTEE, *et al.*, | * | |
| *Plaintiffs*, | * | |
| | * | |
| v. | | No. 1:25-cv-03989-SAG |
| | * | |
| JARED DEMARINIS, *et al.*, | * | |
| *Defendants*. | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Daniel M. Kobrin

_____

DANIEL M. KOBRIN
Federal Bar No. 30392
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
dkobrin@oag.maryland.gov
(410) 576-6472
(410) 576-6955 (facsimile)

April 24, 2026

Attorneys for the Maryland State Board of Elections

**TABLE OF CONTENTS**

Page

STATEMENT OF FACTS ........................................................................................... 3

    The NVRA Prioritizes Voter Registration over Voter Removal............................ 3

    Maryland Law Follows the Lead of the NVRA ........................................................ 6

    Maryland Has Made Reasonable Efforts to Remove Ineligible Voters from
        its Voter Registration List .................................................................................. 8

    Maryland is Not an Outlier in the 2024 EAVS Report ........................................... 9

    Allegations in the Complaint.................................................................................... 11

ARGUMENT............................................................................................................... 13

I.      STANDARD OF REVIEW ................................................................................... 13

II.    PLAINTIFFS' ALLEGATIONS ABOUT POLITICAL ACTIVITIES AND FEARS OF
       VOTE DILUTION DO NOT PROVIDE THEM STANDING. ........................................... 14

    A.    Plaintiffs' voluntary reliance on the voter registration list for its
         partisan organizational activities does not create an injury-in-fact............. 14

    B.    Plaintiffs' allegations of organizational injury make no reference to
         actual instances of disruption. ..................................................................... 17

    C.    The complaint fails to allege any possibility of imminent, future
         injury. ........................................................................................................ 20

    D.    The individual plaintiffs' allegations regarding fears and confidences
         are too generalized to constitute injuries-in-fact. ...................................... 20

III.   THE COMPLAINT FAILS TO STATE A CLAIM BY ALLEGING NO MORE THAN
       A FACTUALLY UNSUPPORTED POSSIBILITY.......................................................... 21

    A.    Plaintiffs' allegations about the State's voter registration rate does
         not sufficiently support their "reasonable efforts" claim. .......................... 22

    B.    Plaintiffs' "inter-county mover" interpretation of the NVRA is not
         supported by the law.................................................................................... 26

    C.    Removing a voter based on undeliverable mail that lacks identifying
         information is not a "reasonable effort.".................................................... 27

    D.    Plaintiffs' allegations regarding deceased voters add nothing to their
         claim. ......................................................................................................... 28

CONCLUSION ......................................................................................................... 30

## TABLE OF AUTHORITIES

### Cases

*American Civil Rights Union v. Martinez-Rivera*, 166 F.Supp.3d 779 (W.D. Tex. 2015) ...

........................................................................................................................... 25

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) ...................................................... 22, 29

*Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310 (2014) ......................................... 8

*Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575 (D. Md. 2014) ........................ 14

*City of New York v. United States Dep't of Def.*, 913 F.3d 423 (4th Cir. 2019) ............... 17

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ........................................................ 16

*Food & Drug Admin. v. All. for Hippocratic Med.* ("*AHM*"), 602 U.S. 367 (2024) ............

.................................................................................................................. 14, 15, 16, 17

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) ................................................... 23, 25

*Green v. Bell*, No. 3:21-CV-00493, 2023 WL 2572210 (W.D.N.C. 2023) ...................... 25

*Husted v. A. Phillip Randolph Inst.*, 584 U.S. 756 (2018) ............................................... 22

*Judicial Watch v. Pennsylvania*, 524 F. Supp. 3d 399 (M.D. Penn. 2021) ...................... 23

*Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019) ........................... 6, 27

*Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) ................................................................. 16

*Maryland Elec. Integrity, LLC v. Maryland St. Bd. Of Elec.*, 127 F.4th 534 (4th Cir. 2025) ................................................................................................................... 21

*Migdal v. Rowe Price-Flemin Intern.*, 248 F.3d 32 (4th Cir. 2005) ................................. 25

*Owens v. Baltimore City State's Attorneys' Office*, 767 F.3d 379 (4th Cir. 2014) ........... 23

*Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006) ..................................... 14

*Public Interest Legal Foundation v. Benson*, 136 F.4th 613 (6th Cir. 2025) .....................

.................................................................................................................. 22, 24, 28, 29

*Republican Nat. Comm. v. North Carolina St. Bd. Of Elec.*, 120 F.4th 390 (4th Cir. 2024) ...................................................................................................................... 14, 16, 17, 20

*Republican National Comm. v. Aguilar*, 2024 WL 4529358 (D. Nev. Oct. 18, 2024) ....................................................................................................................... passim

*Republican National Committee v. Benson*, 754 F. Supp. 3d 773 (W.D. Mich 2024) ....................................................................................................................... passim

*Rucho v. Common Cause*, 588 U.S. 684 (2019) ................................................................. 24

*Pruitt v. Resurgent Capital Serv.*, 610 F. Supp. 3d 775 (D. Md. 2022) ........................... 14

*Silver Star Props. REIT, Inc. v. Hartman VREIT XXI, Inc.*, 2024 WL 308945 (D. Md. Jan. 26, 2024) ...................................................................................................... 20

*United Black Firefighters v. Hirst*, 604 F.2d 844 (4th Cir. 1979) .................................... 14

*Wooten v. University of Maryland, Baltimore*, 733. F. Supp. 3d 402 (D. Md. 2024) . 23, 30

**Statutes**

52 U.S.C. § 20501(b) .......................................................................................................... 3

52 U.S.C. § 20503(a) .......................................................................................................... 3

52 U.S.C. § 20507(a) ........................................................................................... 3, 4, 22, 24

52 U.S.C. § 20507(b) ...................................................................................................... 4, 22

52 U.S.C. § 20507(c) .................................................................................................... passim

52 U.S.C. § 20507(d) ....................................................................................................... 2, 5

52.U.S.C. § 20507(i) .......................................................................................................... 25

52 U.S.C. § 20510(b) ........................................................................................................ 26

Md. Code Ann., Elec. Law § 1-101 ................................................................................ 1, 27

Md. Code Ann., Elec. Law § 3-101 ............................................................................. 2, 7, 27

Md. Code Ann., Elec. Law § 3-102 .............................................................................. 6, 25

Md. Code Ann., Elec. Law § 3-501 ................................................................................... 6

Md. Code Ann., Elec. Law § 3-502 ................................................................................... 7

Md. Code. Ann., Elec. Law § 3-504.................................................................................... 7

**Regulations**

COMAR 33.05.06.06..................................................................................................... 7

COMAR 33.05.07.01..................................................................................................... 7

**Other Authorities**

Election Assistance Comm'n, *EAVS Data Interactive* (Jan. 12, 2026)........................ 10, 11

Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025)............................................................. 10, 11, 22, 29

Maryland State Bd. Of Elec., *Maryland Board of Elections Voter Registration Activity Annual Summary 2025* (Dec. 2025)......................................................................... 8, 9

Maryland State Bd. Of Elec., *Maryland Board of Elections Voter Registration Activity Report December 2025* (Dec. 2025) ............................................................................. 9

Maryland State Bd. Of Elec., *Maryland Board of Elections Voter Registration Activity Report: March 2026* (Mar. 2026). ............................................................................. 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

REPUBLICAN NATIONAL COMMITTEE,    *
*et al.*,

         *Plaintiffs*,    *

       v.    *       No. 1:25-cv-03989-SAG

   *

JARED DEMARINIS, *et al.*,    *

         *Defendants*.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Plaintiffs are the national and State controlling entities of a principal political party[1] and two voters registered in Maryland who affiliate with that party. Together they have sued the Maryland State Board of Elections ("SBE") for an alleged violation of the National Voter Registration Act ("NVRA"). They estimate that the percentage of voting-age citizens registered to vote in Maryland is abnormal and impossibly high. (ECF 32 ¶¶ 77-83.) Based on that estimation, plaintiffs conclude that Maryland is not making reasonable efforts to remove ineligible voters from its voter registration database. Plaintiffs therefore ask this Court to impose "reasonable and effective registration list-maintenance programs . . . to ensure that ineligible registrants are not on the voter rolls." (ECF 32 at 34.)

There is, however, nothing abnormal or impossible about the voter registration rates in Maryland. The NVRA *requires* states to keep potentially ineligible voters in their voter registration databases as a safeguard against accidental removal or abusive purging. 52 U.S.C.

---

[1] A "principal political party" in Maryland is a party whose candidate for Governor garnered the highest or second-highest number of votes in the past gubernatorial general election. Md. Code Ann., Elec. Law § 1-101(kk).

§ 20507(d)(1)(B)(2).  Maryland follows the lead of the NVRA, statutorily erring on the side of protecting voters from unnecessary removal and re-registration.  *See e.g.* Md. Code Ann., Elec. Law § 3-101(f)(1) (prohibiting removal of a registered voter who moves from one county in Maryland to another). And the recent Election Administration and Voting Survey Report published by the Election Assistance Commission shows that Maryland's voter registration statistics are both possible and normal.

In any event, this Court does not need to weigh plaintiffs' allegations against applicable statistics.  Plaintiffs fail to vest this Court with subject matter jurisdiction to entertain their complaint because the complaint presents no concrete and particularized injury to either the organizations or individuals bringing the suit.  It relies instead on the speculative claim that the presence of an unknown number of ineligible voters in the voter registration database that plaintiffs have opted to repurpose for political goals—despite knowing it is necessarily over-inclusive—interferes with the partisan activities of a political party.  But a plaintiff cannot "manufacture its own standing in that way." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) .   And standing aside, plaintiffs fail to state a claim because their complaint asks this Court to infer the statutory violation it alleges.  (ECF 32 ¶ 90.)  Between their estimation of the voter registration rates and their conclusion that Maryland is not making reasonable removal efforts they do not plead any facts. They make no allegation that Maryland either lacks a removal program or is neglecting its duty to perform it.  Instead, the complaint presents the possibility of misconduct and seeks the leave of this Court to investigate it in discovery.  This Court should decline the request and dismiss the complaint under Rule 12(b)(6).  *See Republican National Comm. v. Benson*, 754 F. Supp. 3d 773, 791-92 (W.D. Mich 2024), *aff'd* No. 24-1985, 2025 WL 2731704 (6th Cir. Sept. 25, 2025).

2

**STATEMENT OF FACTS**

**The NVRA Prioritizes Voter Registration over Voter Removal**

Congress enacted the NVRA in response to the "declining numbers of voters who participate in Federal elections." S. Rep. 103-6 at 2 (1993); H.R. Rep. 103-09 at 3 (1993). The NVRA set out to standardize voter registration, eliminating restrictive practices that placed obstacles in applicants' way. S. Rep. 103-6 at 3. These included restrictive registration practices that arose from "legitimate" election administration concerns, such as "the maintenance of accurate and up-to-date voter rolls, and the removal of the names of ineligible persons from the rolls." *Id*. And the NVRA specifically sought to eliminate abusive removal practices causing vulnerable voters to "needlessly re-register." *Id*. at 18; *see also id* at 32; H.R. Rep. 103-6 at 15.

Congress thus set four purposes for the NVRA: (1) "establish procedures" that would result in increased voter registration; (2) standardize registration processes so that Federal, State, and local governments could implement voter registration practices that "enhanced" voter participation; (3) "protect the integrity of the electoral process"; and (4) "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). To meet the first two purposes, Congress standardized minimum methods by which an individual must be allowed to register to vote: simultaneous application for a motor vehicle license, mail application on a federally designed form, and application in person at a voter registration agency. 52 U.S.C. § 20503(a)(1)–(3). Each state was also required to ensure that an eligible applicant was registered to vote no later than 30 days before an upcoming election. 52 U.S.C. § 20507(a)(1). And election officials were required to send "notice" to each applicant informing them of the "disposition" of their application. 52 U.S.C. § 20507(a)(2).

3

To meet the latter two purposes of the law while abiding the former two, the NVRA permitted a state to remove a voter from a voter registration list for only one of four reasons: at the request of the registrant, the disqualification of the registrant by criminal conviction or mental disability, the death of the registrant, and a change in the registrant's residence. 52 U.S.C. § 20507(a)(3), (4).   The law also required states to operate a "general program" to accurately remove ineligible names from the registration list. *Id* at § 20507(a)(4).   Finally, states were prohibited from removing a voter from the voter registration list "by reason of the person's failure to vote."  *Id*. at § 20507(b)(2).

A state's removal program needed to make "a reasonable effort" to remove voters who had become ineligible by death or change in residence.   52 U.S.C. § 20507(a)(4).   The law provided only one metric for the conduct of that removal program: be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965."  *Id.* at § 20507(b)(1). Congress provided no further guidance or requirements for the conduct of removal efforts—it did not even mandate when or how often such efforts should take place. *See* S. Rep. 103-6 at 20 ("It should be noted that the bill does not mandate any specific time periods for when such list cleaning mechanisms must be used.")

In fact, the NVRA prohibited states from conducting *any* "systematic" program for removing voters in the 90-day period before a primary or general election for federal office.  52 U.S.C. § 20507(c)(2)(A).   The removal program was never intended as the primary means for ensuring the accuracy of a voter registration database, rather Congress intended the new motor-voter mandates (automatic voter registration through motor vehicle administration transactions) to provide "automatic updating of addresses" on an ongoing and continuous basis.  S. Rep. 103-6 at 20.

Finally, the NVRA provided a safe harbor to fulfill the removal program requirement. A state could make a "reasonable effort" to conduct a removal program by using "change of address information supplied by the Postal Service" ("NCOA data") to identify voters that may have moved. 52 U.S.C. § 20507(c)(1)(A). If it appeared from NCOA data that a voter had moved within the "registrar's jurisdiction," the registrar only needed to update the voter's registration record with the new address and send the voter a confirmation notice of the update. *Id*. at § 20507(c)(1)(B)(i).

If, on the other hand, it appeared from NCOA data that the voter moved out of the registrar's jurisdiction, the registrar was obliged to send a postage prepaid and pre-addressed "return card" that contained notice of how the voter would be removed from the registrar's roll for failure to return the notice with information confirming continued eligibility in the registrar's jurisdiction. *Id*. at § 20507(c)(1)(B)(i), (d)(2). A voter that returned the notice with confirmation that they had moved from the jurisdiction could be removed immediately. *Id.* at § 20507(d)(1)(A). However, if the voter failed to return the notice, the NVRA forbade their removal until after that voter failed to vote, or failed to appear to vote, in the registrar's jurisdiction in two, consecutive general federal elections. *Id.* at § 20507(d)(1)(B)(ii).

Under the NVRA, then, election officials were to assume that a registered voter remained eligible until proven otherwise. During an election year, for 180 days out of the year states were forbidden from removing ineligible voters who had moved out of the jurisdiction. *See* 52 U.S.C. § 20507(c)(2)(A). And the NVRA required states to keep potentially ineligible voters on the voter roll for up to four years after learning that those voters may have moved. 52 U.S.C. § 20507(d)(1)(B)(ii). The NVRA thus erred on the side of oversubscription in the name of

5

safeguarding against abusive voter-purging. *See* H.R. Rep. 103-9 at 15 ("Abuses may be found in the design of a [removal] program as well as in its implementation.")

**Maryland Law Follows the Lead of the NVRA**

An individual may register to vote in Maryland when they are: (1) a citizen of the United States; (2) a resident of the State; and (3) at least 16 years old. Elec. Law § 3-102(a)(1). Registered voters must be at least 18 years old to vote in a general election. *Id.* at § 3-102(a)(2). A 17-year-old registered voter may vote in a primary election if they will turn 18 before the subsequent general election. *Id.* Maryland's voter registration database therefore contains 16- and 17-year-old registrants.

Maryland's voter registration database is called MDVOTERS. *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 432 (D. Md. 2019). State law assigns the responsibility to "maintain" and "administer" MDVOTERS to the State Administrator of Elections. Elec. Law § 3-101(c)(1). In that role, the State Administrator must "establish and conduct" a removal program that identifies voters who have changed their address, *id*. at § 3-101(c)(4), and, in turn, "instruct the local boards" on how to remove voters who are no longer eligible, *id*. at § 3-101(c)(3)(iii). Ultimately, voter registration in Maryland is conducted "continuously" under the "supervision" of the State Administrator of Elections. *Id*. at § 3-101(d).

In accordance with the NVRA, Maryland law permits a voter to be removed from MDVOTERS only when the voter requests removal, Elec Law § 3-501(1); becomes ineligible due to death, conviction, or incapacity, *id.* at § 3-501(2); moves outside the State, as ascertained by certain processes, *id.* at § 3-501(3); or is subject to an administrative challenge and determined to be ineligible, *id.* at § 3-501(4). Importantly, a registered voter in Maryland *may*

6

*not* be removed from MDVOTERS because of a move from one county in Maryland to another county in Maryland. *Id*. at § 3-101(f)(1).

The State Administrator collects, aggregates, and dispenses data from multiple sources to ensure the accuracy and currency of MDVOTERS. For deceased voters, the State Administrator receives periodic reports from the Maryland Department of Health and the Social Security Administration. Elec. Law § 3-504(a)(1)(ii). The clerks of the state and federal court systems in Maryland provide information on individuals convicted and imprisoned for felony offenses. *Id*. at § 3-504(a)(1)(ii), (a)(2). And the state court system provides information on individuals who have changed their name, *id* at § 3-504(a)(1)(iv), and responded to juror questionnaires, COMAR 33.05.06.06.

The State Administrator also collects data on voters who have potentially moved. State law requires pre- and post-election mailings that help identify when a voter has changed their address. *See* COMAR 33.05.07.01. And SBE is a member of ERIC, "a non-profit organization with the sole mission of assisting states to improve the accuracy of America's voter rolls." Maryland State Bd. Of Elec., *Voter Registration List Maintenance* accessible at https://tinyurl.com/2nfyhnkz (last visited Apr. 24, 2026). SBE shares its voter registration data with ERIC so that it can be compared and matched with NCOA data, identifying registered voters in Maryland who have submitted change-of-address information to USPS for a move to a different state. *Id*.

Removal based on a move outside the jurisdiction follows the NVRA "safe harbor" process. If an election official receives "any information" that a registered voter "moved to a different address within the State," the election official changes the voter's address in MDVOTERS and sends the voter a confirmation notice of the change. Elec. Law § 3-502(b); *see*

52 U.S.C. § 20507(c)(1)(B)(i) (requiring the same of a state's program).  If, however, "it appears from information provided by the postal service," that a voter moved to an address outside the State, the voter is sent a forwardable mail notice with a postage-prepaid return card asking the voter to confirm the move and informing the voter of their potential removal from MDVOTERS. Elec. Law § 3-502(c); *see* 52 U.S.C. § 20507(c)(1)(B)(ii) (requiring the same of a state's removal program).  That voter may be removed from MDVOTERS only when they confirm, in writing, that they have moved outside the State, Elec. Law § 3-502(e)(1), or, when they fail to respond to the notice card *and* fail to vote, or appear to vote, for two consecutive general elections after the date that the notice was sent to them, Elec. Law § 3-502(e)(2).

### Maryland Has Made Reasonable Efforts to Remove Ineligible Voters from its Voter Registration List

SBE publishes voter registration statistics.[2] *See* Maryland State Bd. Of Elec., *Voter Registration Statistics & Data* accessible at https://tinyurl.com/2v2ecns8. Each month SBE publishes a report on voter registration activity, totaling the number of registered voters added and removed from MDVOTERS.  *See e.g.* Maryland State Bd. Of Elec., *Maryland Board of Elections Voter Registration Activity Report: March 2026* accessible at https://tinyurl.com/3z6fb5v9 (Mar. 2026).  SBE also publishes yearly voter registration reports. *See e.g.* Maryland State Bd. Of Elec., *Maryland Board of Elections Voter Registration Activity Annual Summary 2025* accessible at https://tinyurl.com/38k8x7ke (Dec. 2025).  The annual reports aggregate the new registration and removal data, reporting how many voters were added

---

[2] This Court may consider SBE's monthly voter registration statistics in deciding the motion to dismiss because plaintiffs expressly reference them in their complaint (ECF 32 ¶ 76; ECF 1-2 at 13) and rely on them in bringing their action.  *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 314 (D. Md. 2014).

to and removed from MDVOTERS during the calendar year (organized by source of registration and method of removal).  *Id*.

SBE has consistently removed ineligible voters from MDVOTERS.  Since 2019, SBE has removed approximately 260,000 to 340,000 voters from MDVOTERS every year; with anywhere from 80,000 to 180,000 of those removals stemming from the NVRA "mail verification" process. *Voter Registration Statistic & Data* at *Annual Summaries 2019, 2020, 2021, 2022, 2023, 2024 and 2025* (last visited April 24, 2026).  With a total of approximately 4.1 million voters in MDVOTERS over that time, those removals represent SBE pruning 6.3% to 8.3% of its voter database every year.   *Id*.   And those removals are separate from the approximate 10,000 to 50,000 duplicate registrations SBE identifies every year through the registration process.  *Id.*

**Maryland is Not an Outlier in the 2024 EAVS Report**

In June 2025, the United States Election Assistance Commission ("EAC") published its Election Administration and Voting Survey Report.[3]  Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report*, accessible at https://tinyurl.com/5n8pcnhs (June 2025) (the "EAVS Report").  The EAC has updated the data in its report, which can be parsed through an online tool.  Election Assistance Comm'n, *EAVS Data Interactive*, accessible https://tinyurl.com/56ue2m6w (Jan. 12, 2026) ("EAVS Tool").  Based on that data, Maryland's registration and removal rates did not deviate materially from its sister jurisdictions or national averages.

---

[3] This Court may consider the 2024 EAVS Report because it is expressly referenced in the complaint (ECF 32 ¶ 78) and plaintiffs rely on it in bringing their action.  *Bey*, 997 F.  Supp. 2d at 314.

The EAVS Report provided that, nationally, 234,504,358 voters were "registered and eligible to vote" in the 2024 general election—211,144,275 were classified as "active" registrations. EAVS Report at 131-32. Based on 2023 population estimates, those numbers meant that, in 2024, approximately 96.1% of American civilians aged 18 or older were registered to vote, and 86.6% were actively registered. *Id.* at 134. A majority of states reported active registration rates greater than 80%. *Id.* at 132. The report counseled, though: "data on registered and eligible voters as reported in the EAVS should be used with caution, as these totals can include registrants who are no longer eligible to vote in that state but who have not been removed from the voter lists because the removal process laid out by the NVRA can take up to two election cycles to be completed." *Id.* at 131.

Between the close of registration for the 2022 election and the close of registration for the 2024 election, states removed 21,298,175 voters from their voter rolls, or 9.1% of voters registered nationally. *Id.* at 152. Approximately 62% of states reported removing between 3% and 10% of their total registered voters. *Id.* And approximately a third of all removals occurred as a result of the NVRA mail-information process, in which removal cannot take place until a voter has failed to vote, or appear to vote, in two consecutive elections. *Id.* at 153.

Maryland's voter registration statistics were in line with national rates. Maryland was reported as having 96.4% of its estimated civilian, voting-age population actively registered to vote—one of 18 jurisdictions with a rate greater than 90%. EAVS Tool at *EAVS Voter Registration 1 – Active Registrations and CVAP*. Of course, the EAC noted that because it used 2023 population estimates to estimate 2024 registration rates, and because some ineligible voters "may take up to two election cycles to be removed from the voter registration rolls," the reported active voter registration rates could be inflated and, in some cases, "100% or more." *Id.*; *see*

10

*also* EAVS Report at 161.[4]   Moreover, Maryland was reported as having removed 264,617 voters from its list, or 5.8% of its total voters.   EAVS Report at 185.   Nearly 47% of those removed voters, or 123,312 registered voters, were removed as a result of the NVRA mailing process. *Id.*

### Allegations in the Complaint

The complaint first seeks to establish injuries-in-fact for the four plaintiffs.   It lists various political activities and fundraising activities in which the political parties engage.  (ECF 32 ¶¶ 16-29, 34-37.)   For all of these activities, the complaint alleges that both party entities (national and state) are injured by the fact that ineligible voters remain in the voter registration database.   According to plaintiffs, the presence of ineligible voters in the voter registration database causes the party to waste time, effort, and resources.  (*See generally* ECF 32 ¶¶ 17-27, 29, 34-37.)   This "divert[s] resources from other efforts that are critical" to the parties' "core activities."  (ECF 32 ¶ 37.)   But the complaint only identifies "electing Republican candidates" and "turning out Republican voters" as core activities for the national party (ECF 32 ¶ 14); it identifies no core activities for the state entity.

For the individual registered voters, the complaint alleges that each voter "fears that ineligible voters can and do vote in Maryland elections."  (ECF 32 ¶¶ 40, 43.)   According to the complaint, these hypothetical ineligible votes dilute the individual plaintiffs' votes and undermine the individual plaintiffs' confidence in the integrity of Maryland's elections.  (*Id.*) The complaint further alleges that, because of the individual plaintiffs' roles in a political party's organization, they share the "same interests as the RNC" and seek to vindicate those interests in the same way.  (ECF 32 ¶¶ 41, 44.)

---

[4] The EAVS Tool listed Alaska as having a 105.5% active registration rate in 2024. EAVS Tool at *EAVS Voter Registration 1 – Active Registrations and CVAP.*

The complaint then alleges that, under the NVRA, states must make reasonable efforts towards removing ineligible voters "due to death or change of residence." (ECF 32 ¶ 53.) It asserts that Maryland's active voter registration rate indicates that the State is failing in that statutorily imposed duty. (ECF 32 ¶¶ 89-90.) And it thereafter speculates how Maryland allegedly reached such "abnormal" registration rates. (ECF 32 ¶ 83.)

The complaint first points to Maryland's treatment of inter-county movers as different than out-of-state movers. (ECF 32 ¶¶ 93-99.) Because Maryland does not remove county-to-county movers like it removes out-of-state movers, it is allegedly violating the NVRA's removal program requirement. (ECF 32 at ¶ 98.) The complaint continues by asserting that Maryland's "mailing practices" further violate the NVRA because of a March 2015 policy "to stop conducting list maintenance using undeliverable mail returned by USPS that bears a yellow return label without any identifying information such as the voter's name." (ECF 32 ¶ 101.) The plaintiffs claim that this decade-old policy, together with the lack of other list-maintenance measures, shows a lack of "reasonable efforts" to remove ineligible voters. (ECF 32 ¶ 103.)

Finally, the complaint charges Maryland with failing to follow State law in making reasonable efforts to remove deceased voters from the voter registration list. (ECF 32 ¶¶ 104-118.) But the complaint does not cite to any State law. Instead, it references a 2023 legislative audit of MDVOTERS and asserts that no corrective measures were ever adopted to address operational questions identified by the audit for removing deceased voters. (ECF 32 ¶¶ 108-111.) And the complaint asserts that SBE recently "enacted an official policy to make it more difficult for local election officials to remove deceased voters by restricting the types of source materials they can use to cancel registrations of deceased voters." (ECF 32 ¶ 114.)

Plaintiffs therefore ask this Court for declaratory and injunctive relief.  For the injunction, the complaint specifically requests:

> An order instructing Defendants to develop and implement reasonable and effective registration list-maintenance programs to cure their failure to comply with section 8 of the NVRA and to ensure that ineligible registrants are not on the voter rolls;

(ECF 32 at 34.)  The complaint lists six instances of NVRA litigation in which governmental entities settled out of court or removed voters from the voter roll at the behest of plaintiffs.  (ECF 32 ¶¶ 122-127.)  The complaint does not list any case in which plaintiffs obtained the court order they seek in this case.

## ARGUMENT

### I.   STANDARD OF REVIEW

A motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) is properly granted "where a claim fails to allege facts upon which the court may base jurisdiction." *Pruitt v. Resurgent Capital Servs.*, 610 F. Supp. 3d 775, 779 (D. Md. 2022).   The plaintiff bears the burden of establishing subject matter jurisdiction. *People for the Ethical Treatment of Animals, Inc. v. Tabak*, 662 F. Supp. 3d 581, 588 (D. Md. 2023).

Under Rule 12(b)(6), a motion to dismiss tests the sufficiency of the complaint placed before the court. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). Legal conclusions disguised as factual allegations may be rejected. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  And conclusory factual allegations "devoid of any reference to actual events" may also be discounted. *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 586 (D. Md. 2014) (citing *United Black Firefighters v. Hirst*, 604 F.2d 844 (4th Cir. 1979)).

II.    **PLAINTIFFS' ALLEGATIONS ABOUT POLITICAL ACTIVITIES AND FEARS OF VOTE DILUTION DO NOT PROVIDE THEM STANDING.**

Plaintiffs' efforts to challenge other states' voter roll maintenance efforts under the NVRA have been dismissed for lack of standing, and this case should be too. Voter roll maintenance does not directly interfere with political parties' electioneering efforts, and an organizational plaintiff cannot spend its way around that Article III hurdle. *Republican Nat. Comm. v. Aguilar*, 2024 WL 4529358, at *6 (D. Nev. Oct. 18, 2024); *see Republican Nat. Comm. v. Benson*, 754 F. Supp. 3d 773, 788 (W.D. Mich. 2024), *aff'd*, No. 24-1985. 2025 WL 2731704 (6th Cir. Sept. 25, 2025). Chief Judge Diaz has endorsed this "appropriately stricter view of organizational standing." *Republican Nat. Comm. v. North Carolina St. Bd. Of Elec.* ("*NCSBOE*"), 120 F.4th 390, 410-11 (4th Cir. 2024) (Diaz, C.J. concurring). This Court should follow suit and dismiss.

An organization suing in its own right must "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Food & Drug Admin. v. Alliance for Hippocratic Med.* ("*AHM*"), 602 U.S. 367, 394 (2024). To satisfy these requirements, the plaintiff must establish that the defendant "directly … interfered" with its "core business activities." *Id.* at 395. But Maryland's list maintenance program does not directly interfere with "electing Republican candidates" and "turning out Republican voters" (ECF 32 ¶ 14); the harms alleged in the complaint are conclusory, speculative, and attenuated; and plaintiffs do not allege an imminent future injury that their proposed injunction could redress.

A.    **Plaintiffs' voluntary reliance on the voter registration list for its partisan organizational activities does not create an injury-in-fact.**

Maryland's maintenance of its voter registration database does not "directly … interfere[] with" plaintiffs' "core business activities." *AHM*, 602 U.S. at 395.  Plaintiffs allege that the national entity's core mission is to "elect Republican candidates to state and federal office."

14

(ECF 32 ¶¶ 12, 14-16.)  In service of that mission, plaintiffs have voluntarily elected to leverage the State's publicly-available voter list as a tool for achieving partisan goals. (*See e.g.*, ECF 32 ¶¶ 17, 22, 23.) Plaintiffs made that choice knowing that state voter rolls are over-inclusive for their purposes because the NVRA's protective removal provisions build in a procedural lag that necessarily produces an over-inclusive registration list, a deliberate choice that promotes turnout and prevents exclusion. *Supra*, p. 5-6.  Plaintiffs cannot now allege that inaccuracies in the voter roll injure them when they knew well that such inaccuracies were inherent in the roll, and they fail entirely to indicate (much less specify) the magnitude of any alleged inaccuracies.

The organizational plaintiffs can continue their electioneering activity with or without relying on Maryland's voter rolls; they have simply opted to repurpose publicly available data for their own private aims. *Aguilar*, 2024 WL 4529358, at *8. The possibility that a Republican voter remains listed in Montgomery County after moving to Howard County does not "interfere[]" with Plaintiffs' efforts to convince that voter to support partisan policies or candidates, much less "directly" so. *AHM*, 602 U.S. at 395. It just means the voter list hasn't *optimized* plaintiffs' electioneering efforts.  And plaintiffs' requested relief—removal of an unspecified number of voters from the registration list—does not restore their contact with the moved voter.  (ECF 32 at ¶ 34.) As another court put it in rejecting a nearly identical theory: "Even assuming, arguendo, that there has not been proper voter list maintenance, RNC can still carry on its mission and continue to register voters." *Aguilar*, 2024 WL 4529358, at *8.

Nor may plaintiffs bootstrap their voluntary choice to rely on the State's list into an injury by claiming to spend money on mailers that may not reach their intended addressee. (*Cf.* ECF 32 ¶¶ 34-35.) A plaintiff "cannot spend its way into standing simply by expending money," *AHM*, 602 U.S. at 394, and the Fourth Circuit has "consistently held that standing cannot be

15

established on the sole basis of an organization's uncompelled choice to expend resources," *NCSBOE*, 120 F.4th at 396. Plaintiffs have chosen to effectuate their core mission—election of Republican candidates—by spending money on a particular item; nothing compels them to do so, and nothing stops them from relying on their own internal records or other available data if they believe that Maryland's data is not optimized for that specific expenditure.

Plaintiffs thus allege the very "uncompelled choice to expend resources" that the Fourth Circuit has rejected. *Id.* They cannot "create" standing by choosing to rely on voter registration data that they know contains ineligible voters and then argue that their partisan expenditures are hampered because there are an unspecified number of ineligible voters in the data. A contrary result would permit Plaintiffs to demonstrate injury "not from any actions taken by [defendants], but rather from the [plaintiffs'] own budgetary choices." *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("respondents cannot manufacture standing merely by inflicting harm on themselves").

*Republican National Committee v. North Carolina State Board of Elections*, 120 F.4th 390, provides an instructive contrast. There, the organizational plaintiffs challenged North Carolina's refusal to strike 225,000 identified voters who it said were unlawfully registered because the state's registration form failed to capture the identifying information required under the Help America Vote Act. The organizational plaintiffs had standing, though "just barely," *id.* at 408 (Diaz, C.J., concurring), because the alleged large-scale illegal registrations directly interfered with the plaintiffs' asserted "core mission" of "fighting for election security" and required the RNC to "divert" resources from electioneering activities to combat the fraud they said was enabled by 225,000 improper registrations, *id.* at 397-98; *see id.* at 411-12 (Diaz, C.J., concurring).

16

Although Plaintiffs vaguely reference fraud in their complaint, they allege no diversion of resources to anti-fraud activities, nor do they allege that Maryland's database directly impedes their electioneering activities. Instead, they allege that Maryland has not sufficiently *helped* them (by some unquantified amount) by supplying a voter file better calibrated to their political objectives. Allegations that money could be spent more effectively if Maryland's data were better in unspecified ways is not sufficient under *AHM* or *NCSBOE*. And plaintiffs' choice to spend more time knocking on doors is worlds apart from *NCSBOE*, where standing was undisputed and the RNC quantified the magnitude of the resources it diverted because of the 225,000 people who were never properly registered in the first place. *Id.* at 395 & n.1.

Accepting plaintiffs' theory in this case "would mean that all the organizations in America would have standing to challenge almost every" government database they rely on simply because the database is not tuned to their unique needs. *AHM*, 602 U.S. at 395. The Fourth Circuit has cautioned against this result: "If a party could seek review any time the federal government's alleged non-compliance made a government program less useful than it might otherwise be, the possibilities for litigation would be endless." *City of New York v. United States Dep't of Def.*, 913 F.3d 423, 435 (4th Cir. 2019). That risk is particularly acute under the NVRA. If a political party is injured when the voter file is too over-inclusive, and other plaintiffs are injured when the file is too under-inclusive, courts will be forced to superintend endless tug-of-war litigation demanding opposite outcomes.

**B.      Plaintiffs' allegations of organizational injury make no reference to actual instances of disruption.**

Even if plaintiffs could manufacture standing by repurposing the voter file for electioneering and then complain that it doesn't work well enough for that purpose, the complaint's allegations are too vague, speculative, and attenuated to confer standing. *AHM*, 602

17

U.S. at 394. Plaintiffs allege three theories of harm: operational burdens, wasted expenditures, and risk of fraud. And they allege generally that inaccuracies in the voter registration list, which contains voters registered with both principal political parties and voters unaffiliated with any political party, directly injures Republican interests. (ECF 32 ¶ 38.) But the complaint fails to explain "*how*" Maryland's voter roll causes these purported harms, *Aguilar*, 2024 WL 4529358, at *8, or to support its claims with sufficiently "specific" allegations, *Benson*, 2025 WL 2731704, at *2.

To start, the complaint's operational allegations are "too conclusory to constitute injury in fact." *Id.* at *3; *see* (ECF 32 ¶¶ 18-21, 23-25, 27-29.) Plaintiffs allege, for example, that overinclusive voter rolls "impede" their ability to provide "effective registration services." (ECF 32 ¶ 18.) But they never explain "*how*" this over-inclusiveness interferes with such efforts, and they do not identify a single Maryland registration initiative that the voter file impeded. *Aguilar*, 2024 WL 4529358, at *8. Plaintiffs similarly assert that overinclusive registration lists "hinder[]" "ballot-chase programs." (ECF 32 ¶ 19.) But they, again, do not explain how (an overinclusive list would still include all eligible voters worth "chasing"), and they identify no "specific … outreach efforts that were directly impacted" by Maryland's list. *Benson*, 2025 WL 2731704, at *2. Plaintiffs further allege that they are unsure whether to "prioritize" "voter registration" or "voter turnout." (ECF 32 ¶ 21.) But they never explain how they make these determinations, how the rolls impair this decision-making, or how decision-making in Maryland has been affected. Plaintiffs' failure to explain how Maryland's voter file actually interferes with specific activities renders their claims too conclusory for standing.

The wasted-expenditure allegations in the complaint are too speculative to confer standing. *See* (ECF 32 ¶¶ 22, 26, 29, 34-37.) The lead example of harm is expressly *hypothetical*:

18

"[i]f even five percent" of Maryland's registrations are inaccurate, MDGOP would supposedly have wasted $75,000 on one race. (ECF 32 ¶ 35.) But the complaint never alleges what percentage of Maryland's registrations are actually overinclusive, whether any oversubscription inures to Republicans more so than Democrats or unaffiliated voters, what portion of that over-inclusiveness is attributable to the alleged violations rather than the NVRA's own mandatory notice-and-wait procedures, and never alleges how many of plaintiffs' supposedly wasted contacts involved ineligible registrants the State could lawfully have removed sooner. (ECF 32 ¶ 35.) Nor does it account for the fact that eliminating additional registrants—plaintiffs' requested relief—would inevitably remove eligible Republican voters who simply have not voted or responded to a mailer in two election cycles, purging the very voters plaintiffs are trying to reach and swapping one source of allegedly-wasted expenditures for another. *Cf. Aguilar*, 2024 WL 4529358, at *7. The wasted-expenditure allegations thus fail to identify concrete harm, much less connect that harm to the "conduct complained of" and explain how it could be redressed. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Plaintiffs' theory that "inaccurate voter rolls increase the likelihood of fraud … in a manner that harms the RNC and MDGOP" is even more vague and attenuated. (ECF 32 ¶ 30.) Plaintiffs do not allege *any* factual content to substantiate that conclusory assertion. *See Benson*, 2025 WL 2731704, at *2; *Aguilar*, 2024 WL 4529358, at *5. They do not allege that a single person has actually voted fraudulently in Maryland because of improper list maintenance. *Cf.* (ECF 32 ¶ 31.)

Against these deficient allegations, the Fourth Circuit's decision in *NCSBOE* again offers an instructive contrast. There, the alleged harm flowed from a specific statutory violation alleged in the complaint (a defect in the State's registration form), which resulted in a defined universe

19

of allegedly unlawful registrants (225,000 people), and could be resolved by the RNC's targeted request for relief (requiring those registrants to provide the missing information or vote provisionally). *Id.* at 397-98; *see id.* at 411-12 (Diaz, C.J., concurring). Plaintiffs here do not say how overinclusive they believe Maryland's voter rolls are, do not explain how their operational functions are harmed by the alleged NVRA violations, and do not isolate the purported inefficiencies caused by the State's alleged NVRA violations from the same inefficiencies they would experience if their requested injunction issued. Indeed, their requested relief—that Maryland render its list maintenance more "reasonable" in unspecified ways, (ECF 32 at ¶ 30)— is nothing more than a vague and improper "obey-the-law" injunction. *Silver Star Props. REIT, Inc. v. Hartman VREIT XXI, Inc.*, 2024 WL 308945, at *4 (D. Md. Jan. 26, 2024).

### C.    The complaint fails to allege any possibility of imminent, future injury.

Plaintiffs' standing allegations share a third fatal deficiency: they "fail[] to satisfy the imminence requirements of Article III." *Benson*, 2025 WL 2731704, at *2. The complaint "fails to show how its allegations of prior injury" translate to an "imminent *future* injury" that could be addressed through prospective relief. *Id.* at *3 (emphasis added) (cleaned up). Plaintiffs do not identify a single registration, turnout, or other campaign initiative that they plan to undertake in the future and that the State's list allegedly will directly impair. The closest the complaint comes is a bare and isolated allegation that MDGOP's wasted-expenditure harms "will continue to occur in future races." (ECF 32 ¶ 35.) That unadorned allegation lacks specificity and thus "fails to sufficiently plead 'a real and immediate threat of repeated injury.'" *Benson*, 2025 WL 2731704, at *3 (quoting *Tenn. Conf. of the NAACP v. Lee*, 139 F.4th 557, 567 (6th Cir. 2025)).

### D.    The individual plaintiffs' allegations regarding fears and lost confidence are too generalized to constitute injuries-in-fact.

The individual plaintiffs' claims should also be dismissed for lack of standing. They

20

allege that, as a result of Maryland's allegedly over-inclusive voter rolls, they "reasonably fear[] that ineligible voters can and do vote in Maryland elections," diluting their "legitimate vote[s]" and undermining their "confidence in the integrity of Maryland elections." (ECF 32 ¶¶ 40-43.) But the Fourth Circuit has rejected indistinguishable allegations for lack of standing. "[V]ote dilution caused by the counting of an unknown number of invalid third-party votes affects all voters in a State in the same way." *Maryland Elec. Integrity, LLC v. Maryland St. Bd. Of Elec.*, 127 F.4th 534, 540 (4th Cir. 2025). It is accordingly an "undifferentiated, generalized grievance about the conduct of government that fails to confer Article III standing." *Id.* (cleaned up). *Aguilar* and *Benson* dismissed identical allegations from individual plaintiffs as too generalized to "establish a particularized injury." *Aguilar*, 2024 WL 4529358, at *4-5; *see Benson*, 754 F. Supp. 3d at 787 (similar).

Plaintiffs' allegations are also too speculative. They "merely insinuate that voter fraud could happen, not that it is 'certainly impending' or that there is a 'substantial risk' that it would happen due to inaccurate voter rolls," and their alleged "lack of confidence" injury requires a "long chain of hypothetical contingencies" as a result of list maintenance. *Aguilar*, 2024 WL 4529358, at *4.

### III.    THE COMPLAINT FAILS TO STATE A CLAIM BY ALLEGING NO MORE THAN A FACTUALLY UNSUPPORTED POSSIBILITY.

The NVRA requires states to "conduct a general program that makes a reasonable effort to remove" deceased voters and voters who have moved out of a jurisdiction. 52 U.S.C. § 20507(a)(4). A "reasonable effort" is "rational and sensible," not "perfect" or "optimal." *Public Interest Legal Foundation v. Benson*, 136 F.4th 613, 625-26 (6th Cir. 2025). When removing deceased voters, the ongoing and consistent use of state health department data and Social Security records constitutes "reasonable efforts." *Bellitto v. Snipes*, 935 F.3d 1192, 1206-

07 (11th Cir. 2019).  And for removal of voters who have moved, courts are cautioned against imposing "their own standard of reasonableness" on election policies that go beyond the NVRA's confirmation mailing provision.  *Husted v. A. Phillip Randolph Inst.*, 584 U.S. 756, 778 (2018).  Finally, any reasonable effort must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965."  52 U.S.C. § 20507(b)(1)

Plaintiffs plead by implication.  They opine that Maryland's voter registration rates are "abnormally or . . . impossibly high" (ECF 32 ¶ 83) and plead the implication that the high rates are caused by a failure to remove ineligible voters (ECF 32 ¶ 90).  They offer no factual support for this implication, such as identifying ineligible voters that should have already been removed under state practice and federal law.  Instead, they confine themselves to arguing that certain state policies on voter removal are unreasonable.  (ECF 32 ¶¶ 92-118.)  But plaintiffs are wrong. Maryland's voter registration rates are not abnormal in the context of the NVRA's removal restrictions and national voter registration rates.  *See* EAVS Report at 134, 156-60.  And, in any event, this Court does not need to decide between competing theories for Maryland's registration rate, because plaintiffs do not offer factual support for the theory they claim.

### A. Plaintiffs' allegations about the State's voter registration rate do not sufficiently support their "reasonable efforts" claim.

To survive a motion to dismiss under Federal Rule 12(b)(6), a complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully."  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678)).  The complaint must contain sufficient factual detail to show a "more-than-conceivable" chance of success on the merits.  *Owens v. Baltimore City State's Attorneys' Office*, 767 F.3d 379, 396 (4th Cir. 2014). If all a court can do is "infer" the "mere possibility of misconduct," then the complaint has failed to state a claim.  *Wooten v. University of Maryland, Baltimore*, 733 F. Supp. 3d 402, 413 (D. Md.

22

2024) (quoting *Iqbal*, 556 U.S. at 678). And if a complaint presents an outcome and asks the Court to assume the defendant's conduct caused it, it fails to state a claim. *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).

In a case like this, where an organization seeks to allege a violation of the NVRA's removal program requirements, it is insufficient to compare population statistics to voter registration totals. *See Benson*, 754 F. Supp. 3d at 791-92; *see also Judicial Watch v. Pennsylvania*, 524 F. Supp. 3d 399, 405-07 (M.D. Penn. 2021). Alleging a failure to make reasonable efforts on the basis that voter registration rates are "impossibly" or "suspiciously" high without plausibly alleging "any specific breakdown in [a state's] removal program" amounts to nothing more than presenting conclusory assertions parroting the language of the statute. *Benson*, 754 F. Supp. 3d at 792. And population numbers alone, especially when out-of-date, do not plausibly indicate that a State is violating the NVRA. *See id.* at 792-93; *see also Judicial Watch*, 524 F. Supp. 3d at 406.

Plaintiffs present this Court with voter registration rates. Those rates alone, however, do not state a claim. A high registration rate indicating the presence of ineligible voters in a voter registration database is a feature of the NVRA, not a violation. *See* 52 U.S.C. § 20507(c)(1)(B) (prohibiting removing voters suspected of moving out-of-state until, among other things, two general elections have passed); *see also* 52 U.S.C. § 20507(c)(2) (prohibiting removal of voters who moved out of state, as part of general removal program, for 180 days of an election year). In other words, the "central problem" a court faces in deciding whether a state is making reasonable efforts towards removal is not determining whether there are ineligible voters on a registration list, but determining when the number of ineligible voters "has gone too far." *Rucho v. Common Cause*, 588 U.S. 684, 701 (2019) (quotation omitted). And a registration rate, alone,

cannot meaningfully differentiate for a court between an acceptable number of ineligible voters (countenanced by the NVRA) from an unacceptable number (resulting from a lack of reasonable efforts). *See Public Interest Legal Foundation*, 136 F.4th at 628 (reasoning, in part, that the state's efforts to remove deceased voters from its roll was reasonable because the number of deceased voters on the list was an acceptably "small percentage").

Nowhere is this shortcoming better illustrated than plaintiffs' request for relief. Plaintiffs ask this Court to order the development and implementation of a removal program "to ensure that ineligible registrants are not on the voter rolls." (ECF 32 at 30.) But that relief "flips the statutory mandate on its head"—the NVRA requires states to "ensure" that "any eligible applicant is registered to vote," not the other way around. *Benson*, 754 F. Supp. 3d at 793 (citing 52 U.S.C. § 20507(a)(1)). And ineligible registrants may appear in the list. Nonetheless, plaintiffs must ask for that relief because they cannot, based on the allegations plead, differentiate between an acceptable number of ineligible voters being in the State's voter database and an unacceptable number that would indicate a lack of reasonable efforts.

The plaintiffs thus plead a "sheer possibility." *Giacomelli*, 588 F.3d at 193. Their allegations require this Court to assume not only that a high registration rate indicates the presence of ineligible voters (as opposed to, in this case, the presence of successful online and automatic voter registration systems, *see* Elec. Law §§ 3-203 & 3-204.1, and the presence of 16- and 17-year-old registrants in the database, *see* Elec. Law § 3-102(a)), but also that ineligible voters are present in numbers sufficient to evidence a "specific breakdown" of Maryland's general program for removal. *Benson*, 754 F. Supp. 3d at 792. This Court would have to infer misconduct, i.e., a lack of reasonable efforts, entirely from an outcome (a voter registration rate)

24

when no other alleged facts in the complaint support the notion that misconduct took place. *See Painter's Mill Grille*, 716 F.3d at 350.

Plaintiffs will likely argue that the inference of an NVRA violation is all that is needed at the pleading stage, and that this Court can only decide the viability of that inference after discovery. *See Green v. Bell*, No. 3:21-CV-00493, 2023 WL 2572210, *5 (W.D.N.C. 2023); (*see also* ECF 32 ¶ 90 (quoting *American Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 805 (W.D. Tex. 2015)). But "plaintiffs cannot simply promise the court that once they have completed discovery, something will turn up." *Migdal v. Rowe Price-Flemin Intern.*, 248 F.3d 32, 328 (4th Cir. 2001). Plaintiffs' assertion that a high registration rate equates with a lack of "reasonable efforts" is only viable because they conclude as much. That conclusion unsupported by facts cannot "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678.

It is also not unreasonable to expect plaintiffs to plead more at this point. The NVRA expressly requires public disclosure of "records" documenting the "programs and activities" for maintaining the "accuracy and currency" of MDVOTERS. 52.U.S.C. § 20507(i)(1). Before filing a complaint, then, plaintiffs could already do what they aim to do in discovery: review Maryland's records to identify ineligible voters improperly left in the database. They likely possess many of those records already—their complaint asserts that they use Maryland's voter registration records for a myriad of political activities. (ECF 32 ¶¶ 16-29, 34-37.) Those records could have made their pre-suit notice more effective, identifying and enumerating actual registrants requiring removal rather than vague allegations of oversubscription.[5] And those

---

[5] The complaint anecdotally mentions three individuals who plaintiffs allege are ripe for such removal. (ECF 32 ¶¶ 116-117.) But plaintiffs do not identify these individuals (precluding their removal in this case) nor do they plead how three individuals evidence a statewide lack of "reasonable efforts." And plaintiffs did not communicate these individuals' existence to the State Board or State Administrator in their pre-suit notice. (*See* ECF 1-2.) Had they done so, SBE

records gave them the opportunity to allege more in their complaint than the quotient of voter registration totals divided by population estimates.

**B.    Plaintiffs' "inter-county mover" interpretation of the NVRA is not supported by the law.**

Plaintiffs claim that the safe harbor provision of the NVRA differentiates between intra-county movers (moving within a county), inter-county movers (moving from one county within the state to another), and inter-state movers (moving from Maryland to a different state).  (ECF 32 ¶¶ 92-95.)  In their view, inter-county movers must be treated the same as inter-state movers; that is, they must be sent a confirmation notice card and removed from MDVOTERS if they fail to return the card and fail to participate in two consecutive general elections.  (ECF 32 ¶ 98.)  SBE's treatment of inter-county movers like intra-county movers (updating their address rather than removing them), is thus an alleged failure to make reasonable effort because it is in violation of a "mandatory" NVRA process.  (*Id.*)

Plaintiffs are wrong because the NVRA does not impose differing obligations based on whether a voter moves within a locality or among localities in a state.  The NVRA premises the duty to initiate the removal process on a registrant moving "to a different residence address not in the same registrar's jurisdiction."  52 U.S.C. § 20507(c)(1)(B)(ii).  It then defines "registrar's jurisdiction" disjunctively, tying it to the geographic area over which a unit of government maintains and administers voter registration operations.  *Id.* at § 20507(j).  In other words, the registrar's jurisdiction is a municipality or locality when that unit of government maintains and administers the voter rolls; and a registrar's jurisdiction is a state when voter registration is administered at a statewide scale.

---

would have had the opportunity to defuse the allegations by "correct[ing]" the issue before suit was filed.  52 U.S.C. § 20510(b)(2).

Maryland's voter roll is a "statewide voter registration list."  Elec. Law § 3-101(a). Plaintiffs correctly acknowledge in their complaint: "Maryland Law designates the Administrator of Elections as the State's chief election official charged with overseeing and maintaining voter registration."  (ECF 32 ¶ 69; *see also* ¶¶ 70-71); Elec. Law § 3-101(c); *Judicial Watch*, 399 Supp. 3d at 432-33 (noting how MDVOTERS is maintained centrally by the election officials working under the State Administrator of Elections). The "registrar's jurisdiction" in Maryland is the entire state.  52 U.S.C. at § 20507(j).

Accordingly, a voter need only be sent a confirmation mailing and removed after two elections if they don't return it, after they move out of the State.  52 U.S.C. § 20507(c)(1)(B)(ii). If the voter moves to a new address within the State, whether in a new county or not, the voter has "moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered."  *Id.* at § 20507(c)(1)(B)(i); *see also* Elec. Law § 3-101(f) (prohibiting a voter from being removed after moving from one county to another).  Plaintiffs' allegations thus fail as a matter of law.

> **C.     Removing a voter based on undeliverable mail that lacks identifying information is not a "reasonable effort."**

Plaintiffs allege summarily that in 2015 SBE directed local boards of elections to "stop conducting list maintenance using undeliverable mail returned by USPS that bears a yellow return label without identifying information such as the voter's first name."  (ECF 32 ¶ 101.) This directive, together with a "lack of other list-maintenance measures," allegedly evidences a lack of reasonable efforts to remove voters. (ECF 32 ¶ 103.)  Plaintiffs provide no further factual support for this allegation.

Plaintiffs' scant allegation answers itself—undeliverable mail returned "without identifying information" cannot be used to reliably identify an ineligible voter.  To be sure,

27

Maryland uses undeliverable mail to update voter registration records. But the "processing varies depending on the information contained on the USPS 'yellow' sticker on returned mailings." Maryland St. Bd. Of Elec., *Voter Registration List Maintenance* accessible at https://tinyurl.com/2nfyhnkz. If the yellow sticker does not contain identifying information, then the undeliverable mail cannot reliably identify a voter, or voter record, to maintain. *Public Interest Legal Foundation*, 136 F.4th 625 (holding that a "reasonable effort" need only be "rational and sensible"). And the NVRA, in emphasizing voter enrollment over voter removal, does not require the State to begin the confirmation mailing process towards removal based on identity-less undelivered mail. *See* 52 U.S.C. § 20505 (providing that a registrar "may" begin the confirmation mailing process when a notice of application disposition is "returned undelivered").

### D.     Plaintiffs' allegations regarding deceased voters add nothing to their claim.

Plaintiffs' final allegations assert that the State has not made reasonable efforts to remove deceased voters from MDVOTERS. However, Maryland routinely uses records from both its Department of Health and the Social Security Administration to identify and remove deceased voters. *See* Elec. Law § 3-504(a)(1)(ii), (a)(3). Using that data the State removed 88,132 deceased voters from the list between 2022 and 2024. EAVS Report at 185. As a matter of law, Maryland makes reasonable efforts towards removing deceased voters from MDVOTERS. *See Bellitto*, 935 F.3d at 1206-07.

Nonetheless, plaintiffs claim that there are two unaddressed deficiencies in the State's removal program that were identified in a 2023 legislative audit, which found 2,426 deceased individuals with active voter registrations. (ECF 32 ¶¶ 108-110.) First, SBE allegedly refused to remove a deceased voter unless "the death record matched the registration name in spelling and

28

format." (ECF 32 ¶ 108.) And second, SBE was allegedly aware that it was not receiving complete data from the Maryland Department of Health on all individuals who died in Maryland. (ECF 32 ¶ 109.) Because the State did not correct either deficiency after the audit, according to the plaintiffs, it failed to make reasonable efforts at removal.

The legislative audit's findings do not show a lack of reasonable efforts. The 2,426 "potentially deceased individuals" identified by the audit made up .058% of the entries in the 4,148,651-voter registration database at that time. "That vanishingly small percentage is in-and-of-itself indicative that [Maryland] has taken rational, sensible steps to maintain accurate voter rolls." *Public Interest Legal Foundation*, 136 F.4th at 628.

More importantly, plaintiffs' own exhibit demonstrates that their allegation is incorrect. SBE responded to the audit findings as part of the audit report. (ECF 1-1 at 25.) And in response to the audit finding, SBE pledged to adhere to a more flexible, "fuzzy," matching criteria for matching death records to registered voters. (*Id.* at 26, 28, 30-31.) As for the receipt of incomplete health records, SBE entered into a new, comprehensive data-sharing agreement with the Department of Health in May of 2024. Maryland State Bd. Of Elec., *Administrator's Report* at 2, accessible at https://tinyurl.com/53edhnfh (May 23, 2024). Under the new data-sharing agreement, SBE would begin receiving records of Maryland residents who died out of state. *Id.* SBE thus adopted measures to address both "deficiencies" plaintiffs allege.

Finally, plaintiffs make a conclusory allegation about an SBE policy restricting local officials from removing deceased voters. (ECF 32 ¶ 114.) Plaintiffs do not name the policy, describe how it works, or otherwise explain how it constitutes a violation of the NVRA. In fact, plaintiffs only allege that the policy "exacerbates existing loopholes." (*Id.*) This final allegation is a "naked assertion of wrongdoing" and otherwise fails to provide "fair notice" of the

29

"grounds" for plaintiffs' entitlement to relief. *Wooten*, 733 F. Supp. 3d at 413. It adds nothing to plaintiffs' effort to state a claim for relief.

## CONCLUSION

For the reasons set forth above, the motion to dismiss should be granted for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Daniel M. Kobrin

_____
DANIEL M. KOBRIN
Federal Bar No. 30392
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
dkobrin@oag.maryland.gov
(410) 576-6472

April 24, 2026

Attorneys for the Maryland State Board of Elections

30